UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

WOODROW FLEMMING,

                                        Plaintiff,

                                                                9:11-CV-00804

v.
                                                                (NAM/TWD)

NANCY SMITH, et al.,

                                        Defendants.

_____

APPEARANCES:                            OF COUNSEL:

WOODROW FLEMMING
Plaintiff *pro se*
P.O. Box 146
New York, New York 10039

HON. ERIC T. SCHNEIDERMAN              RICHARD  LOMBARDO
Attorney General for the State of New York    Assistant Attorney General
Counsel for Defendants
The Capitol
Albany, New York 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## REPORT-RECOMMENDATION AND ORDER

        This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983,

has been referred to me for Report and Recommendation by the Hon. Norman A. Mordue, Senior

United States District Judge, pursuant to 28 U.S.C. § 636(b) and N.D.N.Y. L.R. 72.3(c).  In his

original Complaint, Plaintiff set forth nine causes of action alleging numerous claims against

forty-two defendants arising out of his confinement at Upstate Correctional Facility ("Upstate").[1] (Dkt. No. 1.)  By Decision and Order dated June 28, 2012, Judge Mordue dismissed all but two of Plaintiff's causes of action asserted against twenty-one remaining defendants pursuant to 28 U.S.C. § 1915A(b).

The two surviving causes of action alleged the denial of adequate medical care and deliberate indifference to Plaintiff's serious medical needs in violation of his rights under the Eighth Amendment.  The remaining Defendants were Upstate medical staff members Nancy Smith ("Smith"), Nurse Administrator; Evelyn Weissman ("Weissman"), M.D.; Richard Adams ("Adams"), M.D.; Patrick Johnson ("Johnson"), P.A.; Glenn Schruyer ("Schruyer"), R.N. II; Dianna Harvey ("Harvey"), R.N. II; Patsy Nakahara ("Nakahara"), R.N. II; George Waterson ("Waterson"), R.N. II; Marla Travers ("Travers"), R.N. II; Elizabeth White ("White"), R.N. II; Renee Holmes ("Holmes"), R.N. II; Dana Griffith ("Griffith"), R.N. II; Julia Gordon ("Gordon"), R.N. II; David Hammac ("Hammac"), R.N. II; Rodney Cook ("R. Cook"), R.N. II; Neil Cook ("N. Cook"), R.N. II; James Chesbrough ("Chesbrough"), R.N. II; Christy Conklin ("Conklin"), R.N. II; Kathy Sullivan ("Sullivan"), R.N. II; Rosanna Lordi ("Lordi"), R.N. II; and Candy Atkinson ("Atkinson"), R.N. II.

The matter is currently before the Court for the screening of Plaintiff's Amended Complaint (Dkt. No. 49), filed following the conditional grant of the remaining Defendants'

---

[1]  The District Court found that the three-strikes provision of 28 U.S.C. § 1915(g) barred Plaintiff from proceeding *in forma pauperis*. (Dkt. No. 14).  Plaintiff has filed more than thirty lawsuits in the Northern District of New York since 2005.  *See* https://ecf.nynd.cir2. dcn/cgi-bin/iquery.pl?17461056886244-L_1_1-0-480245-pty-pla-plaintiff (last visited June 26, 2014).

motion to dismiss Plaintiff's Complaint with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(2) and (b)(6).  (Dkt. No. 48.)  For the reasons set forth below, the Court finds that Plaintiff has failed to correct the deficiencies in his original Complaint and recommends that Plaintiff's Amended Complaint be dismissed with prejudice.

## I.  BACKGROUND

### A.  Allegations of the Original Complaint

Plaintiff was confined at Upstate after being transferred there in 2005 for infirmary placement while he served time in the Special Housing Unit.[2]  (Dkt. No. 1 at 22-23.)  In October of 2009, Plaintiff complained of feeling weak to Defendants Johnson, Atkinson, Sullivan, Smith, White, Harvey, and Nakahara.  (Dkt. No. 1 at second ¶ 73.)  Although Plaintiff alleged that the Defendants to whom he complained failed to act in response to his complaints, he acknowledged in his Complaint that he was taken to the hospital three times in connection with the weakness. *Id.*  The third time, blood work revealed Plaintiff may have been being over-medicated at Upstate.  *Id.*

Plaintiff also claimed to have serious medical problems with his left shoulder, back, hip and knees which Defendants knew about and nonetheless failed to diagnose, and denied his requests to be examined by a doctor and given treatment and therapy.  *Id*. at  ¶¶ 61, 63, 65, 67, 72, 74.  Plaintiff identified the Defendants to whom he complained about his left shoulder, back, hip, and knee as Weissman, Smith, Johnson, Nakahara, Waterson, White, Holmes, Griffith, Gordon, Hammac, R. Cook, N. Cook, Chesbrough, Sullivan, Lordi, and Atkinson.  *Id*. at ¶¶ 72,

---

[2]  According to Plaintiff, his original Complaint "consolidated issues from July 2008 within 3 years filing."  (Dkt. No. 1 at ¶ 56.)

73. Plaintiff also complained that on July 29, 2010, Defendant Adams, a physician at Upstate, took away the walking cane Plaintiff used for his left side and left leg weakness and his pain medication, without an examination or therapy. *Id*. at ¶ 68.

On September 28, 2010, Plaintiff fell and was taken to the emergency room at the Alyce Hyde Medical Center in Malone, New York, by authorization of Defendant Weissman, another Upstate physician. (Dkt. Nos. 1 at ¶ 74; 39-1 at 7-9.) X-rays taken of Plaintiff's lumbar spine, left shoulder, left hip, left knee, pelvis, c-spine, chest and ribs were negative. (Dkt. No. 1 at 52.) Plaintiff was also given a head CT scan and diagnosed with a concussion. *Id*.; Dkt. No. 39-1 at 9. Plaintiff alleged that neither his concussion nor complaints about head pain and nosebleeds after the fall were addressed following return to Upstate. (Dkt. No. 1 at ¶¶ 74-75, 77.) Plaintiff identified the Defendants to whom he complained about his headaches and nosebleeds for over the nine months following his concussion as Adams, Smith, Waterson, Atkinson, Sullivan, Lordi, Conklin, Hammac, Travers, White, Holmes, Griffith, R. Cook, and Schruyer. *Id*. While at Upstate, Plaintiff was given a blood test that revealed his blood platelet count was somewhat elevated. *Id.* at ¶ 76. The results of a follow up test on March 14, 2011, showed a more significantly elevated count of 869. *Id*. at ¶ 78 and 26. The normal range is 144-400. *Id*. Although Plaintiff alleged that the medical staff did nothing for him, he has also acknowledged in his Complaint that a decision was made to send to him to an outside doctor in April of 2011. *Id*. at ¶ 79. Defendant Adams ordered a hematology consult based upon the blood test results and report. (Dkt. No. 39-1 at 38.) Plaintiff signed a contract for specialty care on March 21, 2011. *Id.* Plaintiff was seen by a hematologist on April 26, 2011, and the results of his blood work were reviewed by a provider on May 2, 2011. (Dkt. No. 1 at 35.) Based upon the hematologist's

recommendation, Plaintiff was prescribed Hydroxyurea 500 mg twice daily, ASA 325 mg daily, and an abdominal ultrasound and a follow-up hematology consult was ordered.  *Id*.

**B.      Ruling on Defendants' Motion to Dismiss**

Defendants moved to dismiss the remaining Eighth Amendment claims in Plaintiff's original Complaint on the grounds that: (1) the District Court lacked personal jurisdiction over the Defendants because Plaintiff failed to serve the summons and complaint in the manner required to obtain personal jurisdiction; (2) the Complaint failed to state a claim upon which relief could be granted under 42 U.S.C. § 1983; and (3) Defendants were entitled to qualified immunity.  (Dkt. No. 36.)

This Court recommended that Defendants' motion to dismiss for failure to state a claim be granted with leave to amend.  (Dkt. No. 45.)  The Court's recommendation was based upon: (1) Plaintiff's failure to allege any non-conclusory facts suggesting deliberate indifference on the part of Defendants Johnson, Atkinson, Sullivan, Smith, White, Harvey, and Nakahara with regard to his claim of weakness, *id*. at 14-15; (2) Plaintiff's failure to allege non-conclusory facts plausibly showing that he had a serious medical condition with regard to his claims of pain in his back, hips, and knees, and failure to allege any non-conclusory facts suggesting deliberate indifference with regard to his frozen shoulder and pain in his back, hips and knees by Defendants Weissman, Smith, Johnson, Nakahara, Waterson, White, Holmes, Griffith, Gordon, Hammac, R. Cook, N. Cook, Chesbrough, Sullivan, Lordi, and Atkinson, *id*. at 16-20; (3) records annexed to Plaintiff's Complaint failed to support his claim that he needed a walking cane, and Plaintiff failed to allege non-conclusory facts showing deliberate indifference on the part of Defendant Adams in taking away the cane in July of 2010, *id*. at 20-21; (4) Plaintiff's failure to

5

allege facts regarding the medication alleged to have been wrongfully discontinued by Adams, the medical condition for which the medication was being taken, and the facts and circumstances surrounding the alleged discontinuance, *id*. at 21; (5) Plaintiff's failure to allege sufficient facts to make a facially plausible showing that the headaches and nosebleeds of which he complained constituted serious medical conditions and failure to allege non-conclusory facts showing deliberate indifference with regard his concussion, headaches and nosebleeds by Defendants Adams, Smith, Waterson, Atkinson, Sullivan, Lordi, Conklin, Hammac, Travers, White, Holmes, Griffith, R. Cook, and Schruyer, *id*. at 22-23; and (6) failure to allege non-conclusory facts supporting a claim of deliberate indifference on the part of Adams or any other Defendant with regard to Plaintiff's claim that treatment for his elevated blood platelets was delayed. *Id*. at 23-24.

The District Court accepted this Court's recommendation that Defendants' motion to dismiss be granted for failure to state a claim, with leave to amend, and ordered that the action would be dismissed with prejudice for failure to state a claim unless Plaintiff filed an amended complaint within thirty-days. (Dkt. No. 48.) The District Court also ordered that if Plaintiff filed an amended complaint that survived initial review, new summonses were to be issued for defendants named in the amended complaint, since service of the initial summons and complaint on defendants was inadequate. *Id*.

**C.      Allegations of Amended Complaint**

Plaintiff filed a nearly illegible handwritten Amended Complaint with voluminous

exhibits on September 23, 2013.[3]  (Dkt. No. 49.)  A day later, Plaintiff filed additional medical

records and grievance records in support of his Amended Complaint.  (Dkt. No. 50.)  Plaintiff's

Amended Complaint asserts the same Eighth Amendment claims for deliberate indifference to

his serious medical needs as his original Complaint.[4]  While wordier and more repetitive than his

original Complaint, the allegations in Plaintiff's Amended Complaint are no less conclusory and

do not correct the deficiencies in the original Complaint.

## II.    LEGAL STANDARD

Under 28 U.S.C. § 1915A (2006), "[t]he court shall review . . . a complaint in a civil

action in which a prisoner seeks redress from a[n] . . . employee of a governmental entity."  28

U.S.C. § 1915A(a) (2006).[5]  In conducting this review, "the court shall identify cognizable claims

---

[3]  A large number of the documents annexed to Plaintiff's Amended Complaint relate to matters that occurred prior to July 2008, the date Plaintiff identified as the start time for the claims asserted in his lawsuit and have no relevance in this action.

[4]  In his Amended Complaint, Plaintiff has also attempted to resurrect the supervisory claims relating to his placement and the inadequacy of his care in the special housing unit, as well as inadequate training and supervision claims against defendants Smith and Weissman and a number of original defendants, including Lester Wright, against whom the Complaint was dismissed on initial review.  (*See, e.g.*, Dkt. No. 49 at ¶¶ 24, 26, 32.)  The claims, as asserted in the Amended Complaint, suffer from the deficiencies that led to their dismissal on initial review.  (*See* Dkt. No. 21.)

[5]  Although Plaintiff was released from custody in or about March of 2014 (Dkt. No. 56 at 2), he was incarcerated at the time this action was commenced and when he filed the Amended Complaint.  (*See* Dkt. Nos. 1 and 49.)  Therefore, § 1915A is applicable.  *See Rogers v. New York City Police Dept.*, No. 12 CV 3042 (CBA)(MG), 2012 WL 4863161, at *1 n.3, 2012 U.S. Dist. LEXIS 147663, at *4 n.3 (E.D.N.Y. Oct. 12, 2012) (a plaintiff who has been released from incarceration is still considered a prisoner under § 1915A if he was imprisoned at the time the action was commenced); *see also Brown v. Jacobson*, No. 98 Civ. 0565 LBS, 1999 WL 1125122, at * 5, 1999 U.S. Dist. LEXIS 18921, at *13-14 (S.D.N.Y. Dec. 8, 1999) (prisoner's complaint subject to heightened scrutiny under the Prison Litigation Reform Act of 1999 even after release from custody because it advances concerns about prison officials' misconduct) (citing *Johnson v. Hill*, 965 F. Supp. 1487, 1488 n.2 (E.D.Va. 1997)).

or dismiss the complaint, or any portion of the complaint, if the complaint (1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." [6]   28 U.S.C. §1915A(b)(1-2) (2006)

To survive dismissal for failure to state a claim, a complaint must plead enough facts to state a claim that is "plausible on its face."[7] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  While Rule 8(a) of the Federal Rules of Civil Procedure, which sets forth the general rules of pleading, "does not require detailed factual allegations, . . . it demands more than an unadorned, the-defendant-harmed-me accusation." *Id*. In determining whether a complaint states a claim upon which relief may be granted, "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836 (1994) (citation omitted).  "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*.

Because a court has a duty to show liberality towards *pro se* litigants, *Nance v. Kelly*, 912

---

[6] In determining whether an action is frivolous, the court must look to see whether the complaint lacks an arguable basis either in law or in fact.  *Neitzke v. Williams*, 490 U.S. 319, 325 (1989) (superceded by statute on other grounds).

[7] Where a plaintiff proceeds *pro se*, the pleadings must be read liberally and construed to raise the strongest arguments they suggest.  *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008) (citation omitted).

F.2d 605, 606 (2d Cir. 1990) (*per curiam*), extreme caution should be exercised in ordering *sua sponte* dismissal of a *pro se* action. *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983).

## III.    ANALYSIS

Claims that prison officials have intentionally disregarded an inmate's serious medical needs fall under the Eighth Amendment umbrella of protection from the imposition of cruel and unusual punishments. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). Prison officials must ensure, among other things, that inmates receive adequate medical care. *Id*. (citing *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)).

A claim that prison officials have intentionally disregarded an inmate's serious medical needs has both objective and subjective elements. *See Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009). "The plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Id*. at 72. (citation and internal quotation marks omitted). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003) (citation omitted).

A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance,* 912 F.2d at 607) (Pratt, J. dissenting) (citations omitted), *accord Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994); *Chance v. Armstrong*, 143 F.3d 698*,* 702 (2d Cir. 1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or

treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance*, 143 F.3d at 702-03.

Under the subjective element, medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act . . . that evinces 'a conscious disregard of a substantial risk of serious harm.'" *Id.* at 703 (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)). "Deliberate indifference requires more than negligence but less than conduct undertaken for the very purpose of causing harm." *Hathaway*, 37 F.3d at 66. To establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer*, 511 U.S. at 837; *Chance*, 143 F.3d at 702. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer*, 511 U.S. at 835. An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976). Moreover, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim . . . under the Eighth Amendment." *Id.* at 106. Stated another way, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.*; *see also Smith*, 316 F.3d at 184 ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation."). However, malpractice that amounts to culpable recklessness constitutes deliberate indifference. Accordingly, "a physician may be deliberately indifferent if he or she consciously chooses an easier and less

efficacious treatment plan." *Chance*, 143 F.3d at 703 (quoting *Hathaway*, 99 F.3d at 553).

Conclusory allegations that medical staff defendants were aware of a plaintiff's medical needs and failed to provide adequate care are generally insufficient to state an Eighth Amendment claim of inadequate medical care. *See, e.g., Gumbs v. Dynan*, No. 11-CV-857 (RRM)(LB), 2012 WL 3705009, at *12, 2012 U.S. Dist. LEXIS 120664, at *36 (E.D.N.Y. Aug. 26, 2012) ("[C]onclusory allegations that defendants were aware of plaintiff's medical needs and chronic pain but failed to respond are generally not sufficient proof of defendant's deliberate indifference and cannot survive a Rule 12(b)(6) motion to dismiss.") (citing *Adekoya v. Holder*, 751 F. Supp. 2d 688, 691, 697 (S.D.N.Y. 2011) (finding conclusory allegations that medical staff defendants were aware of plaintiff's medical needs and failed to provide adequate care insufficient to defeat a motion to dismiss a claim of inadequate medical care); *Thomas v. Douglas*, No. 9:09-CV-0548 (GLS/DEP), 2010 WL 3724183, at *5, 2010 U.S. Dist. LEXIS 97660, at *15 (N.D.N.Y. Aug. 12, 2010) (deliberate indifference claim set forth in wholly conclusory terms alleging that plaintiff was merely "continuously denied proper treatment," without supporting facts to establish a plausible medical indifference claim cannot survive a motion to dismiss). This case is no exception.

A.     **Plaintiff's Weakness Claim**

Plaintiff has again alleged that he suffered from weakness and dizziness in October of 2009 that resulted in his being hospitalized, thus making a plausible showing that he suffered from a serious medical condition. (Dkt. Nos. 49 at ¶¶ 36-42; 49-1 at 32-47.) However, the allegations in Plaintiff's Amended Complaint with regard to the deliberate indifference component of his Eighth Amendment claim are as conclusory, and therefore as inadequate, as

those in his original Complaint.

In his original Complaint, Plaintiff alleged in conclusory fashion that he complained about his weakness to Defendants Johnson, Atkinson, Sullivan, Smith, White, Harvey, and Nakahara, and they did nothing. (Dkt. No. 1 at ¶ 73.) In his Amended Complaint, Plaintiff has alleged, again in conclusory fashion, that he complained about the weakness not only to the Defendants identified in his original Complaint, but also to Defendants Griffith, Holmes, Gordon, Waterson, Chesbrough, N. Cook, R. Cook, Hammac, Lordi, and Weissman, and that they all intentionally denied or delayed treatment. (Dkt. No. 49 at ¶¶ 39, 42.)

The absence of specific allegations as to how each defendant was deliberately indifferent to Plaintiff's weakness and dizziness is fatal to his claim. *See Alfaro Motors, Inc. v. Ward*, 814 F.2d 883, 887 (2d Cir. 1987) ("[B]road, simple, and conclusory statements are insufficient to state a claim under § 1983."). Therefore, the Court recommends that Plaintiff's Eighth Amendment claim in his Amended Complaint with regard to his weakness and dizziness in October of 2009 be dismissed with prejudice.

**B.     Plaintiff's Left Shoulder, Back, Hip, and Knee Complaints and Stopping Pain Medication**

In his Amended Complaint, Plaintiff again alleges that he had a frozen left shoulder and back, hip, and knee problems that left him in severe pain. (Dkt. No. 49 at ¶¶ 36, 42-44.) As with his original Complaint, Plaintiff has failed to allege facts making a plausible showing that his chronic back pain and hip and knee problems were severe enough to constitute a serious medical condition for Eighth Amendment purposes. *Id*.

Plaintiff has alleged in conclusory fashion in his Amended Complaint that Defendants

Johnson, Adams, Smith, Weissman, Harvey, Hammac, R. Cook, N. Cook, Chesbrough, Conklin, Sullivan, Waterson, Travers, White, Holmes, Griffith, Gordon, Lordi, Atkinson, and Nakahara knew of his frozen shoulder and back, hip, and knee problems and pain and acted with deliberate indifference in denying him the proper medical care and attention and pain medication.[8] *Id.* at ¶¶ 43-44.

This Court explained in its Report-Recommendation and Order on Defendants' motion to dismiss that conclusory allegations that medical staff defendants were aware of a plaintiff's medical needs and failed to provide adequate care were insufficient to state an Eighth Amendment claim for deliberate indifference to a serious medical condition. (Dkt. No. 45 at 14-15.) *See e.g., Adekoya,* 751 F. Supp. 2d at 691 (finding conclusory allegations that medical staff defendants were aware of plaintiff's medical needs and failed to provide adequate care insufficient to defeat a motion to dismiss a claim of inadequate medical care).

Plaintiff has failed to correct the pleading deficiency in his original Complaint with

---

[8] In his Amended Complaint, Plaintiff alleges that discontinuance of the drug Ultram constituted cruel and unusual punishment. (Dkt. No. 49 at ¶ 43.) However, according to the Superintendent's decision on Plaintiff's Grievance No. UST-43915-10, dated September 29, 2010, attached to Plaintiff's Amended Complaint, investigation of the grievance revealed that:

> . . . grievant was seen by his primary provider on 07/29/10. Based on exam and evaluation of medical issues, M.D. ordered Ultram to be tapered down and discontinued. Risk factors associated with Ultram in conjunction with current medical problems can lead to seizures and Seratonin Syndrome. Tylenol 325 mg two times a day for pain was ordered.

(Dkt. No. 49-1 at 64, 91.) *See Matusovsky v. Merrill Lynch*, 186 F. Supp. 2d 397, 399-400 (S.D.N.Y. 2002) (noting that in evaluating a Rule 12(b)(6) motion, a court may consider documents attached to the complaint as exhibits, and "[i]f a plaintiff's allegations are contradicted by such a document, those allegations are insufficient to defeat a motion to dismiss.")

regard to Defendants' alleged deliberate indifference to his frozen shoulder, chronic back pain, and hip and knee problems and need for medication, despite having been given an opportunity to do so. Therefore, the Court recommends that Plaintiff's Eighth Amendment claim in his Amended Complaint with regard to his shoulder, back, hip, knee, and pain medication be dismissed with prejudice.

### C. Plaintiff's Cane

Plaintiff alleges in his Amended Complaint that Defendant Adams, knowing Plaintiff had a weak left hip and many problems with his knee and needed a walking cane to help him stand, took away the cane. (Dkt. No. 49 at ¶ 45.) Plaintiff's conclusory assertion that he needed a cane is contradicted by grievance proceeding documents annexed by Plaintiff to his Amended Complaint. *See Matusovsky*, 186 F. Supp. 2d at 399-400. Plaintiff filed a grievance on July 30, 2010, complaining that on the day before, Defendant Adams, who had never seen him before, took away his cane without first doing an MRI. (Dkt. No. 49-1 at 83.) The Internal Review Grievance Committee found that investigation revealed that there was no clinical indication for the cane, and that RN's had observed Plaintiff ambulating with good physical mobility, upright posture, and steady gait. *Id.* at 98. On appeal from denial of the grievance, the Superintendent affirmed, indicating that Plaintiff had been evaluated by his provider, and there was no indication for a cane. *Id*. at 9. The Central Office Review Committee affirmed, noting that a cane was not medically indicated.

Plaintiff's conclusory allegation that he needed a cane, particularly when contradicted by the grievance documents he himself has submitted, along with his failure to allege facts showing a deliberate indifference to his alleged need for a cane on Defendant Adams' part, fails to make a

plausible showing that Plaintiff's Eighth Amendment rights were violated, and the Court recommends that his claim regarding the cane be dismissed with prejudice.

### D.     Head Pain and Nosebleeds

Plaintiff alleges in his Amended Complaint that he complained about headaches and his daily nose bleeds to Defendants Smith, Weissman, Harvey, Atkinson, Nakahara, Lordi, Hammac, R. Cook, N. Cook, Chesbrough, Conklin, Sullivan, Waterson, Travers, White, Holmes, and Griffith, and they treated his medical needs with deliberate indifference by refusing him the necessary medical treatment.  (Dkt. No. 49 at ¶¶ 46-47.)   As with his initial Complaint, Plaintiff's allegations regarding the Defendants' deliberate indifference are conclusory and wholly inadequate to make a plausible showing of deliberate indifference.  *See e.g., Adekoya,* 751 F. Supp. 2d at 691, 697.  Therefore the Court recommends that Plaintiff's Eighth Amendment claim regarding his headaches and nosebleeds be dismissed with prejudice.

### E.     Plaintiff's Elevated Platelets

In his Amended Complaint, Plaintiff alleges that Defendant Adams did not send him to an outside doctor for a month after finding out his platelet level was elevated to eight-hundred. (Dkt. No. 49 at ¶ 48.)  On a claim based upon a significant delay in receiving treatment, "a plaintiff must allege that the individuals causing the delay had the requisite state of mind, which . . . is the equivalent of criminal recklessness."[9] *Jones v. Vives,* 523 F. App'x 48, 50 (2d Cir. 2013) (citing *Hathaway,* 99 F.3d at 553.  The allegations in Plaintiff's Amended Complaint regarding Defendant Adams' state of mind in treating Plaintiff for elevated blood platelets and

---

[9] It is not at all clear that the one month delay in outside treatment alleged by Plaintiff was significant under the circumstances.

referring him to an outside physician are no less deficient than those in his original Complaint. Therefore, the Court recommends that Plaintiff's Eighth Amendment claim with regard to his platelet count be dismissed with prejudice.

**ACCORDING**, it is hereby

**RECOMMENDED**, that Plaintiff's Amended Complaint (Dkt. No. 49) be dismissed with prejudice under 28 U.S.C. § 1915A; and it is

**ORDERED**, that the Clerk provide Plaintiff with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) ( per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


Dated:  July 2, 2014
        Syracuse, New York

Therese Wiley Dancks
United States Magistrate Judge





Not Reported in F.Supp.2d, 1999 WL 1125122 (S.D.N.Y.)
**(Cite as: 1999 WL 1125122 (S.D.N.Y.))**

H
Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
John BROWN, Plaintiff,
v.
Michael JACOBSON, Commissioner, David Schoenfeld, Warden, Officer Norris, # 4312 Officer Perez, # 14652, Individually and in their Official Capacities, Defendants.

No. 98 Civ. 0565 LBS.
Dec. 8, 1999.

*MEMORANDUM AND ORDER*
SAND, J.

***1** Plaintiff, John Brown, appearing *pro se*, brings this action pursuant to 42 U.S.C. § 1983 against Michael Jacobson, the former Commissioner of the New York City Department of Corrections, David Schoenfeld, the Warden of the Beacon Correctional Center ("BCC") in East Elmhurst, New York, and two corrections officers, Norris and Perez. Mr. Brown alleges civil rights violations that allegedly occurred while he was confined at BCC. Presently before the Court is Defendant Perez's Motion to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim on which relief may be granted. For the reasons set forth below, Defendant's Motion is granted.

I. LEGAL STANDARD

On a motion to dismiss for failure to state a claim upon which relief may be granted, *see* Fed.R.Civ.P. 12(b)(6), we must "construe in plaintiff['s] favor factual allegations in the complaint.... Dismissal of the complaint is proper only where 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." ' *Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.,* 155 F.3d 59, 67 (2d Cir.1998) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46 (1957) (footnote omitted)) (citation omitted).

II. BACKGROUND

The following facts are taken from Plaintiff's Amended Complaint and are assumed to be true for purposes of considering this Motion.

At all times relevant to the Amended Complaint, Mr. Brown was an inmate at BCC and Defendants Norris and Perez were corrections officers at that facility. On August 14, 1997, Mr. Brown was transferred from "Side A" to "Side H" of BCC Block 6. Upon his arrival in Side H and after being locked into his new cell, Plaintiff checked to see whether all of his property had been moved to his new location and realized that certain of his legal documents were missing. Because he was now housed on the top floor of Block 6 and the Corrections Officers on duty were in a glass-enclosed semi-sound-proof "bubble" on a lower floor, the Corrections Officers would not have heard Plaintiff if he had verbally requested that he be allowed to search his former room for the missing documents. Mr. Brown therefore knocked on his cell door to get the officers' attention. Eventually, another inmate notified Officers Perez and Norris that Plaintiff sought to be let out of his cell.

When his cell door was opened, Mr. Brown proceeded to the bubble from which Officers Perez and Norris monitored the cell-block. Officer Perez used the prison intercom system to direct another prisoner, Eric Adoizro, # 349–97–01008, to search for Plaintiff's papers in Plaintiff's previous cell. Meanwhile, Officer Norris questioned Plaintiff regarding why he had knocked on his door so loudly.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 1125122 (S.D.N.Y.)
**(Cite as: 1999 WL 1125122 (S.D.N.Y.))**

Mr. Adoizro located Mr. Brown's papers but was directed by Officer Perez not to deliver them to him. Officer Norris instead took the papers and handed them to Officer Perez, while both remained in the bubble. When Mr. Brown asked the officers for his papers, Officer Norris told him that she would have to think about returning them because she did not approve of the way he had knocked on his cell door. Mr. Brown told Officer Norris that the papers were of great importance to him. Plaintiff's subsequent requests to speak with a captain about the matter were refused by both officers.

**\*2** Mr. Brown remained by the bubble as most other prisoners returned to their cells in order to be locked down for the night. Plaintiff thereafter made additional requests for the return of his papers, all of which Officer Norris refused to honor. Officer Perez then asked over the intercom whether Plaintiff would return to his cell or whether Officer Perez should "call the goon squad." Officer Norris responded that Plaintiff would return to his cell, which Plaintiff did.

At roughly 4:00 a.m. on August 15, after the new shift of corrections officers came on duty, Plaintiff was allowed to leave his cell and enter the bubble to look for the relevant documents. Plaintiff could not find the documents but Corrections Officer Boyer, who is not a party to this action, spotted them near the shower on "Side A" of the block. Officer Boyer returned the package to Plaintiff who, moments later, discovered that certain of the documents were missing or out of place. In particular, Plaintiff discovered that a C.P.L.R. Article 78 petition that he had been drafting had been taken from the folder and that certain legal correspondence had been moved within the folder.

Plaintiff filed a Complaint in this Court on January 27, 1998, and an Amended Complaint on March 6. On July 16, Defendant Schoenfeld moved to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim on which relief may be granted. That Motion was grant-

ed, without opposition, on September 3, 1998. Defendant Jacobson's motion to dismiss was granted on January 11, 1999. *See Brown v.. Jacobson,* No. 98 Civ. 565(LBS) (S.D.N.Y. Jan. 11, 1999).

### III. DISCUSSION

Plaintiff's Amended Complaint alleges two causes of action. The first claims that "by denying plaintiff's request to retrieve his legal documents," the officers "placed a 'Chilling Effect' upon plaintiff's Right of Access to the Courts." (Am. Compl. at ¶ 55.) The second focuses on Mr. Brown's claim that Officer Perez threatened to call the "Goon Squad." (*See id.* at ¶ 36, 56.) Plaintiff alleges that that threat effected his "nerves" and "cause[d] him ... to stay up all night worrying" both about his documents and about the goon squad. (*Id.* at ¶ 56.)

Where, as here, Plaintiff proceeds *pro se,* the Court liberally construes the Complaint and holds it to less stringent pleading standards. *See Boddie v. Schnieder,* 105 F.3d 857, 860 (2d Cir.1997). We interpret a *pro se* plaintiff's complaint "to raise the strongest arguments that they suggest." *Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). When we do so here, we discern two distinct claims: (1) a cause of action for denial of plaintiff's right of access to the courts; and (2) an Eighth Amendment claim arising out of the officers' threats. Because both claims cannot be sustained on the basis of the facts alleged in the Amended Complaint, Defendant's motion to dismiss is granted.

A. Right of Access to the Courts

**\*3** All persons, including prisoners, enjoy a constitutional right of access to the courts. *See Monsky v. Moraghan,* 127 F.3d 243, 246 (2d Cir.1997), *cert. denied, __ U.S. __, 119 S.Ct. 66 (1998).* But that right belongs solely "to litigants or those seeking to be litigants." *See Posr v. Court Officer Shield # 207,* 180 F.3d 409, 413 (2d Cir.1999). To state a claim for denial of access to the courts, therefore, the plaintiff must allege that the defendant's actions hindered the

Not Reported in F.Supp.2d, 1999 WL 1125122 (S.D.N.Y.)
**(Cite as: 1999 WL 1125122 (S.D.N.Y.))**

pursuit of a legal claim. *See id.* (citing *Monsky,* 127 F.3d at 247). That requirement—that an inmate show actual injury—"derives ultimately from the doctrine of standing, a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches." *Lewis v. Casey,* 518 U.S. 343, 349 (1996) (citing *Allen v. Wright,* 468 U.S. 737, 750–52 (1984); *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 471–76 (1982)).

Construing Plaintiff's complaint as liberally as we can, Mr. Brown seems to be presenting three distinct allegations of actual injury. His Amended Complaint claims that: (1) the officers' actions led to the loss of an Article 78 petition; (2) the loss of his legal documents caused him emotional distress; and (3) the officers' actions discouraged him from pursuing litigation. None of these allegations is sufficient to satisfy Plaintiff's burden of alleging an actual injury relevant to his claim of a denial of access to the courts.

### 1. Loss of an Article 78 Petition

Plaintiff alleges that "an Article 78 which [he] had been working on for over two months" was missing from his collection of legal documents after it was finally returned to him. (*See* Am. Compl. at ¶ 46.) "[T]he injury requirement," however, "is not satisfied by just any type of frustrated legal claim." *Lewis,* 518 U.S. at 354. The "universe of relevant claims has been extended only slightly," from criminal proceedings to include "civil rights actions—i.e., actions under 42 U.S.C. § 1983." *Shepherd v. Fraisher,* No. 96 Civ. 3283(JGK), 1999 WL 713839, at *6 (S.D.N.Y. Sept. 14, 1999) (quoting *Lewis,* 518 U.S. at 354) (internal quotation marks omitted). The right has never been extended to Article 78 proceedings. Moreover, even if frustration of an Article 78 proceeding were actionable as a denial of the right of access to the courts, Plaintiff would also have to allege that the officers' action "actually interfered with his access to the courts or prejudiced an existing action." *See Herrera v. Scully,* 815 F.Supp. 713, 725 (S.D.N.Y.1993). Mr.

Brown's complaint alleges no facts suggesting that he was unable to file the Article 78 petition, or that the Article 78 proceeding was an existing action that was prejudiced by the loss of the paper in question. The allegation of loss of an "Article 78," therefore, does not establish an actual injury.

### 2. Emotional Distress

**\*4** Although Plaintiff alleges that the officers' actions affected his "nerves" and caused him to lose sleep as part of his second cause of action (*see* Am. Compl. at ¶ 56), we believe that, construing his complaint liberally, he might also be alleging emotional distress as an injury related to the loss of his legal documents. However, while "emotional distress and humiliation ... might be consequential damages components of a section 1983 claim in which actual injury to court access was sufficiently alleged, they are not the type of actual injury that gives rise to a constitutional claim of denial of access to the courts." *Monsky,* 127 F.3d at 247; *see also Brown v. Brabazon,* No. 98–2387, 1998 WL 953964, at *1 (2d Cir. Jan. 7, 1998). The allegations of nervousness and loss of sleep, therefore, do not satisfy the actual injury requirement.

### 3. Chilling Effect

Finally, Plaintiff's complaint might be read to allege that the combination of the threats, along with the confiscation of his legal documents, discouraged him from pursuing a legal claim or defense. We presume that this is the significance of his reference to a "chilling effect." (*See* Am. Compl. at ¶ 55.) Of the three possibilities we have considered, this claim is the most promising, although it, too, is ultimately unavailing. Several courts have recognized that a cause of action lies when a prison official threatens an inmate so as to discourage the pursuit of litigation. *See, e.g., Hudspeth v. Figgins,* 584 F.2d 1345, 1348 (4th Cir.1978) (per curiam); *Brown v. Coughlin,* 965 F.Supp. 401, 404 (W.D.N.Y.1997); *Gloster v. Wong,* No. 94–CV–490 RSP/GJD, 1997 WL 151766, at *4–5 (N.D.N.Y. Mar. 28, 1997). But in each of those cases,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 1125122 (S.D.N.Y.)
**(Cite as: 1999 WL 1125122 (S.D.N.Y.))**

the plaintiff alleged that the defendants' threats were related specifically to the plaintiff's continuation with particular legal proceedings. *See Hudspeth,* 584 F.2d at 1348; *Brown,* 965 F.Supp. at 405 (denying motion to dismiss when harassment followed immediately after plaintiff filed civil rights action); *Gloster,* 1997 WL 151766, at [*]4 (same). In this case, by contrast, Plaintiff has not alleged that either Officer Norris' or Officer Perez's refusal to return his legal documents was related in any way to his having filed a legal or administrative claim, or even any plan he might have had to file such a claim. To be sure, he alleges that "[t]hese two (2) correctional Officers had to had [sic] been reading plaintiff's legal documents, and because they had read plaintiff's legal material illegally, they refused to bring those documents to plaintiff's new location ... as requested." But the fact that the officers may have read plaintiff's documents, even when considered together with all the other facts alleged in the complaint, does not create an inference that their conduct was related to some legal or administrative action taken or contemplated by the plaintiff. There is no allegation here that the threat of calling the goon squad was, in any way, designed to discourage Mr. Brown from pursuing a legal claim; it does not therefore satisfy Plaintiff's burden of alleging an actual injury.

B. Eighth Amendment

**\*5** Plaintiff's allegation that Officer Perez's threat to call the goon squad caused him to become nervous and lose sleep could be characterized as a distinct cause of action alleging cruel and unusual punishment due to verbal abuse. However, "verbal harassment or profanity alone, unaccompanied by any injury no matter how inappropriate, unprofessional, or reprehensible it might seem does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998) (citation and internal quotation marks omitted); *see also Powell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) (per curiam); *Brown v.. Croce,* 967

F.Supp. 101, 104 (S.D.N.Y.1997); *Ramirez v. Holmes,* 921 F.Supp. 204, 210 (S.D.N.Y.1996); *Beal v. City of New York,* No. 92 Civ. 0718(KMW), 1994 WL 163954, at [*]6 (S.D.N .Y. Apr. 22, 1994). Plaintiff makes no allegation of any physical injury whatsoever, arising out of the incidents described in the Amended Complaint. His complaint does not, therefore, allege a violation of his right to be free from cruel and unusual punishment.

C. Officer Norris

The final issue we must address arises from the fact that it is only Officer Perez's motion that is currently before the Court. (*See* Def.'s Mem. at 2 n. 2 (indicating that the Office of the Corporation Counsel does not represent Officer Norris.) According to court records, Officer Norris was served with summons and complaint on June 30, 1999. To date, however, Officer Norris has filed neither an answer nor a responsive motion. Nevertheless, the Prison Litigation Reform Act of 1996, Pub.L. No. 104–134, 110 Stat. 1321–66 (codified in scattered sections of Title 18, 28, and 42 of U .S.C.) ("PLRA") requires the Court to dismiss a complaint in which a prisoner seeks redress from an officer or employee of a governmental entity if the complaint fails to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915A (West 1999). Although Mr. Brown is apparently no longer incarcerated, because his complaint was filed when he was "a prisoner" *see* 28 U.S.C. § 1915A(c) (West 1999), and because it advances concerns about prison officials' misconduct, it is nevertheless subject to the heightened scrutiny imposed by the PLRA. *See Johnson v. Hill,* 965 F.Supp. 1487, 1488 n. 2 (E.D.Va.1997). Having determined that Mr. Brown's Amended Complaint fails to state a claim on which relief may be granted against Officer Perez, and finding no meaningful distinction between the conduct of Officer Perez and Officer Norris with respect to Brown's allegations, we also conclude that Plaintiff's complaint fails to state a claim on which relief may be granted against Officer Norris. Therefore, pursuant to 28 U.S.C. § 1915A(b)(1), we dismiss *sua sponte*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 1125122 (S.D.N.Y.)
**(Cite as: 1999 WL 1125122 (S.D.N.Y.))**

Plaintiff's claim against Officer Norris. *See Liner v. Goord,* __ F.3d __, No. 98–2925, 1999 WL 734693, at [*]2 (2d Cir. Sept. 22, 1999); *Tapia–Ortiz v. Winter,* 185 F.3d 8, 11 (2d Cir.1999).

### CONCLUSION

**\*6** For the foregoing reasons, Defendant Perez's motion to dismiss is granted and the Court dismisses Plaintiff's claim against Defendant Norris *sua sponte.* The Clerk of the Court is directed to close this case.

S.D.N.Y.,1999.
Brown v. Jacobson
Not Reported in F.Supp.2d, 1999 WL 1125122 (S.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2012 WL 3705009 (E.D.N.Y.)
**(Cite as: 2012 WL 3705009 (E.D.N.Y.))**

Ⓒ

Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Joseph GUMBS, Plaintiff,
v.
Mrs. DYNAN, Assistant Warden of Medical at
MDC–Brooklyn; Medical Department at
MDC–Brooklyn et al.; Mr. Marousis–Bush, Head of
Medical; Mr. Ittayem, Assistant Health Services Ad-
ministrator; Mr. Georgy, Assistant Health Services
Administrator; Dr. Newland, Administrative Director;
Dr. Michael Borecky; Dr. Jusayan; Mr. Edwards,
Counselor of Unit I–61; Known and Unknown Bureau
of Prisons staff (All defendants in official and unoffi-
cial capacity), Defendants.

No. 11–CV–857 (RRM)(LB).
Aug. 26, 2012.

Joseph Gumbs, Freehold, NJ, pro se.

Layaliza K. Soloveichik, United States Attorneys
Office, Brooklyn, NY, for Defendants.

### MEMORANDUM & ORDER

ROSLYNN R. MAUSKOPF, District Judge.

**\*1** *Pro se* plaintiff Joseph Gumbs ("Gumbs"), a
pre-trial detainee held at the Metropolitan Detention
Center ("MDC") Brooklyn, filed the present action
against the Medical Department at the MDC as well as
individual MDC employees pursuant to 42 U.S.C. §
1983, asserting an Eighth Amendment claim of de-
liberate indifference to petitioner's medical needs after
he allegedly sustained neck, back and shoulder inju-
ries from a March 2009 fall at the MDC. (Compl.
Addendum (Doc. No. 1) ¶¶ 2, 5.) Defendants move to

dismiss plaintiff's claim pursuant to Fed.R.Civ.P.
12(b) or, in the alternative, for summary judgment
pursuant to Fed.R.Civ.P. 56. Plaintiff is granted *in
forma pauperis* status for purposes of the present
action. For the reasons set forth herein, defendants'
motion is GRANTED with respect to defendant MDC
Medical Department pursuant to Fed.R.Civ.P.
12(b)(1), under the doctrine of sovereign immunity,
and with respect to individual defendants pursuant to
Fed.R.Civ.P. 56.

### BACKGROUND

Plaintiff arrived at the MDC Brooklyn for
pre-trial detention in February 2009. (Defs.' 56.1 Stmt.
(Doc. No. 26) ¶ 1.) On March 10, 2009, plaintiff fell in
the MDC shower and the "unit officer" [FN1] called for
medical assistance on his behalf. It is alleged that
despite further phone calls by unit officers to the
Medical Department at the MDC "in the days fol-
lowing" the fall, plaintiff received no medical atten-
tion. Plaintiff states that he had no other means of
seeking medical attention except through filing sick
call slips and written requests, [FN2] which he did nu-
merous times to no avail. (Compl. Addendum ¶¶ 2–5.)
Plaintiff states that because he was suffering extreme
pain, he next sought the assistance of defendant
Counselor Edwards, the counselor assigned to plain-
tiff's unit at the MDC, to schedule a medical ap-
pointment. Defendant Edwards allegedly told plaintiff
that "pre-trial inmates are of no great concern here at
MDCBrooklyn. You'll have to just keep filing re-
quests. Now get out of my office." (*Id.* ¶ 6.)

> FN1. Inmates at the MDC are house in sep-
> arate units, and the correctional officer as-
> signed to a given unit on a given shift is
> known as that unit's "unit officer." (Defs.'
> 56.1 Stmt. ¶ 159.)

> FN2. As described in the MDC's Admission

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3705009 (E.D.N.Y.)
(Cite as: 2012 WL 3705009 (E.D.N.Y.))

and Orientation Manual, the primary means for a MDC inmate to obtain medical care is by filling out a sick call sheet and placing it in the sick call box to notify medical personnel that he would like to request an appointment. (*See* Defs.' Reply 56.1 Stmt. (Doc. No. 32) ¶ 40.) If unsuccessful, the Admission and Orientation Manual instructs that an inmate can then submit written requests, commonly known as "copouts" among MDC inmates, to a staff member detailing the need for appropriate medical care. (*Id.* ¶¶ 44–45.)

Plaintiff further alleges that a five-month delay between the March 2009 injury and August 2009 medical visit "prevented the plaintiff from receiving treatment for his injuries and left the plaintiff in a perpetual state of pain." (*Id.* ¶ 7). Medical records show that on August 14, 2009, roughly five months after plaintiff's alleged fall, plaintiff received medical attention from defendant Dr. Borecky for a six-month follow-up regarding his diabetes. FN3 (Defs.' 56.1 Stmt. ¶ 75; *see* Compl. Addendum ¶ 7.) Plaintiff reported that he had been experiencing intermittent pain in his left shoulder for the past two and half months but made no mention of neck or back pain. (Decl. of Layaliza K. Soloveichik ("Soloveichik Decl.") Ex. B (Doc. No. 29, Attach.1) at 24.) Dr. Borecky assessed plaintiff's condition as joint pain in the left shoulder region stemming from a 2005 injury, gave plaintiff a new painkiller prescription, and ordered x-ray films to be taken of plaintiff's left shoulder. (*Id.* at 26; *see* Compl. Addendum ¶ 9.) Contrary to plaintiff's assertion that "the medical staff delayed an additional three months before actually conducting the x-ray" ordered by Dr. Borecky on August 14, 2009 (Compl. Addendum ¶ 9), medical records show that on August 27, 2009, x-rays were taken of plaintiff's left shoulder and the findings of the radiologist were negative. (Soloveichik Decl. Ex. B at 28.)

> FN3. Plaintiff reported that he was diabetic during the health screening given to newly

arrived inmates on February 6, 2009. The August 14, 2009 visit with Dr. Borecky was a six-month follow-up to plaintiff's February 18, 2009 visit with Dr. Borecky at the MDC medical clinic for diabetic inmates. (*See* Def. Am. 56.1 Stmt. ¶¶ 66,70.)

**\*2** In November 2009, plaintiff filed an Inmate Request for Informal Resolution, otherwise known as a BP–8. A BP–8 is the first step in the administrative remedy process. Plaintiff's BP–8, dated November 12, 2009, only identified pain in his left shoulder and was received by MDC staff on November 24, 2009. (*Id.* at 29.) The next day, plaintiff was seen by Dr. Borecky for "progressively worsening pain in the left shoulder." (*Id.* at 30.) On this visit, plaintiff reported that the history of trauma date back to 2005 when his left arm was twisted behind his back during the course of an arrest. (*Id..* ) Dr. Borecky prescribed medication and requested an orthopedic consultation. A follow-up visit was scheduled for February 2010. (*Id.* at 32.) On February 3, 2010, defendant Dr. Jusayan,FN4 who was plaintiff's assigned treating physician approximately from the latter part of 2009 until March 2010 (Defs.' 56.1 Stmt. ¶ 63), examined plaintiff. (Soloveichik Decl. Ex. B at 34.)

> FN4. Individual defendant Dr. Jusayan has not been served.

Plaintiff alleges that approximately thirteen months after sustaining the injuries, plaintiff was sent to see an orthopedic specialist who ordered an MRI scan to be performed, and that it took an additional three months for plaintiff to receive the MRI. (Compl. Addendum ¶ 10.) Medical records indicate that on February 17, 2010, roughly eleven months after plaintiff's March 2009 injury, plaintiff received an orthopedic consultation at New York downtown Hospital, which recommended an MRI of his left shoulder and a return for a second consultation after the MRI. On the same day, Dr. Jusayan requested an MRI for plaintiff's left shoulder as recommended by

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3705009 (E.D.N.Y.)
**(Cite as: 2012 WL 3705009 (E.D.N.Y.))**

the orthopedic clinic, orthopedic surgery as a follow-up after the MRI, and authorized plaintiff to request a two-piece prison jump suit. (Soloveichik Decl. Ex. B at 43–44.) On October 4, 2010, plaintiff underwent an MRI of his left shoulder at New York Downtown hospital. (*Id.* at 49–50.)

The first mention in plaintiff's medical records of lower back pain, but not neck pain, by plaintiff to a member of the MDC medical staff was during a February 2, 2011 visit with defendant Dr. Newland .[FN5] (*See id.* at 66.) On March 11, 2011, plaintiff received a follow-up consultation with an orthopedic surgeon, who recommended physical therapy. (*Id.* at 71.) the MDC approved the request for said physical therapy on March 18, 2011. (Defs.' 56.1 Stmt. ¶¶ 131–33.) On April 18, 2011, plaintiff was evaluated by an outside rehabilitation specialist for the appropriate course of physical therapy and, upon plaintiff's return to the MDC, defendant Dr. Borecky prescribed medication for plaintiff's left shoulder pain and ordered physical therapy to begin. On the same visit, Dr. Borecky also ordered x-rays of plaintiff's cervical and lumbar spine because plaintiff complained of neck and lower pain; this appears to be the first mention of neck pain in plaintiff's medical records. (*See* Soloveichik Decl. Ex. B at 73.)

> [FN5]. Defendant Dr. Newland became plaintiff's assigned treating physician in early 2011. (Defs.' 56.1 Stmt. ¶ 65.)

**\*3** Plaintiff underwent three sessions of physical therapy in June 2011. (Defs.' 56.1 Stmt. ¶¶ 143–44, 147.) On July 7, 2011, plaintiff was seen by Dr. Newland and requested a stop to the physical therapy because of unbearable pain he experienced on each of the three sessions. Dr. Newland granted plaintiff's request to discontinue physical therapy. (*See* Soloveichik Decl. Ex. B at 86, 88.)

Plaintiff, proceeding *pro se,* filed the present ac-

tion on February 15, 2011. By Order dated March 3, 2011, the Court construed plaintiff's § 1983 action as one pursuant to *Bivens v. Six Unkown Fed. Marc. Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) and dismissed the *Bivens* claims against defendant Federal Bureau of Prisons ("BOP") and against individual defendants in their official capacities under the doctrine of sovereign immunity.[FN6] (March 3, 2011 Order (Doc. No. 3).)

> [FN6]. By the same Order, the Court also dismissed plaintiff's *Bivens* claims against individual defendants Cameron Lindsay, the Warden of MDC; the Assistant Warden of Administrative Remedy at MDC; the Central Office Administrative Remedy Coordinator; and the Regional Office Administrative Remedy Coordinator in their individual capacities pursuant to 28 U.S.C. § 1915A(b) for plaintiff's failure to show these defendants' personal involvement in the alleged deprivation of plaintiff's civil rights. (March 3, 2011 Order at 4–5.)

### STANDARD OF REVIEW

"A document filed *pro se* is to be liberally construed and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Boykin v. KeyCorp,* 521 F.3d 202, 214 (2d Cir.2008) (internal quotation marks omitted). Accordingly the Court construes plaintiff's Complaint with "special solicitude" and interprets it to raise the strongest arguments it suggests. *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474–75 (2d Cir.2006) (quoting *Ruotolo v. I.R.S.,* 28 F.3d 6, 8 (2d Cir.1994)).

### Legal Standards Governing Motions Pursuant to Fed.R.Civ.P. 12(b)

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3705009 (E.D.N.Y.)
**(Cite as: 2012 WL 3705009 (E.D.N.Y.))**

*v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A complaint need not contain " 'detailed factual allegations,' " but it must contain "more than an unadorned, the-defendant-unlawfully-harmedme accusation." *Iqbal,* 129 S.Ct. at 1949 (quoting *Twombly,* 550 U.S. at 555). In other words, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly,* 550 U.S. at 555). Rather, the plaintiff's complaint must include "enough facts to state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949 (citing *Twombly,* 550 U.S. at 570). The determination of whether "a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950 (citing *Iqbal v. Hasty,* 490 F.3d 143, 157–58 (2d Cir.2007)).

**\*4** "The standard for a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction is 'substantively identical' to the 12(b)(6) standard, except that the plaintiff has the burden of establishing jurisdiction in a 12(b)(1) motion." *S & R Dev. Estates, LLC v. Bass,* 588 F.Supp.2d 452, 460 (S.D.N.Y.2008); *see Lerner v. Fleet Bank, N.A.,* 318 F.3d 113, 128 (2d Cir.2003). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000) (citing Fed.R.Civ.P. 12(b)(1)); *see also Oscar Gruss & Son, Inc. v. Hollander,* 337 F.3d 186, 193 (2d Cir.2003) ( "Failure of subject matter jurisdiction, of course, is not waivable and may be raised at any time by a party or by the court *sua sponte.*") In considering a motion to dismiss for lack of subject matter jurisdiction, a district court

"must accept as true all material factual allegations in the complaint, but [is] not to draw inferences from the complaint favorable to plaintiffs." *J.S. ex rel. N.S. v. Attica Cent. Sch.,* 386 F.3d 107, 110 (2d Cir.2004) (citation omitted). This Court, however, "may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue, but [it] may not rely on conclusory or hearsay statements contained in the affidavits." *Id.* (citations omitted). "The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." *Aurecchione v. Schoolman Transp. Sys. Inc.,* 426 F.3d 635, 638 (2d Cir.2005).

**Legal Standards Governing Motions Pursuant to Fed.R.Civ.P. 56**

Summary judgment is appropriate when the pleadings, depositions, interrogatories, admissions, and affidavits demonstrate that there are no genuine issues of material fact in dispute and that one party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In deciding a summary judgment motion, a district court must draw all reasonable inferences in favor of the non-moving party. *See id.* at 249 (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)); *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.,* 150 F.3d 132, 137 (2d Cir.1998). Thus, the court must not "weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty America v. Town of W. Hartford,* 361 F.3d 113, 122 (2d Cir.2007) (quoting *Weyant v. Okst,* 101 F.3d 845, 854 (2d Cir.1996)). Any evidence in the record of any

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3705009 (E.D.N.Y.)
**(Cite as: 2012 WL 3705009 (E.D.N.Y.))**

material fact from which an inference could be drawn in favor of the non-moving party precludes summary judgment. *See Castle Rock Entm't,* 150 F.3d at 137.

**\*5** Once the movant has demonstrated that no genuine issue of material fact exists, such that it is entitled to judgment as a matter of law, then "the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.' " *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)). "Conclusory allegations will not suffice to create a genuine issue. There must be more than a 'scintilla of evidence,' and more than 'some metaphysical doubt as to the material facts.' " *Del. & Hudson Ry. Co. v. Consol. Rail Corp.,* 902 F.2d 174, 178 (2d Cir.1990) (citing *Anderson,* 477 U.S. at 252; *Matsushita,* 475 U.S. at 586.) Instead, the non-moving party must present "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson,* 477 U.S. at 256. Only disputes over material facts "that might affect the outcome of the suit under the governing law" will properly preclude the entry of summary judgment. *Id.* at 248; *see also Matsushita,* 475 U.S. at 586.

### *DISCUSSION*
### I. DOCTRINE OF SOVEREIGN IMMUNITY BARS CLAIM AGAINST MDC'S MEDICAL DEPARTMENT

All of plaintiff's claims against the MDC's Medical Department must be dismissed for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1). "Because an action against a federal agency or federal officers in their official capacities is essentially a suit against the United States, such suits are also barred under the doctrine of sovereign immunity, unless such immunity is waived." *Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 510 (2d Cir.1994) (citing *Federal Deposit Ins. Corp. v. Meyer,* 510 U.S. 471, 484–86, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994); *Kentucky v. Graham,* 473 U.S. 159, 166–67, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985)). As such, the Court

hereby dismisses plaintiff's *Bivens* claims against defendant Medical Department at MDC, a federal agency, for a lack of subject matter jurisdiction under the doctrine of sovereign immunity. *See, e.g., Nkansah v. Medical Dept. of MCC,* No. 10 CV 3211, 2011 WL 4073362, at *3 (E.D.N.Y. Sept.13, 2011) (dismissing claims against the MDC's Medical Department for lack of subject matter jurisdiction); *Demartino v. Zenk,* No. 04 CV 3880(SLT)(LB), 2006 WL 1455456, at *4 (E.D.N.Y. May 25, 2006) (dismissing *Bivens* claims against the MDC's Medical Department under doctrine of sovereign immunity); *cf. Keene Corp. v. United States,* 700 F.2d 836, 845 n. 13 (2d Cir.1983) (*"Bivens* authorizes suits against the responsible federal official, not against the government itself, and *Bivens*-type actions against the United States are ... routinely dismissed for lack of subject matter jurisdiction." (citations omitted)).

### II. CLAIMS AGAINST INDIVIDUAL DEFENDANTS ARE NOT ADMINSTRATIVELY EXHAUSTED UNDER THE PLRA AND REQUIRE DISMISSAL

Plaintiff's *Bivens* claims against individual defendants are dismissed for failure to exhaust administrative remedies before bringing said claims in federal court.

### A. Standard for Administrative Exhaustion Under the PLRA

**\*6** The Prison Litigation Reform Act ("PLRA") requires inmates to exhaust available administrative remedies before filing actions under federal law challenging prison conditions.[FN7] 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."); *see Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002) ("[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general cir-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3705009 (E.D.N.Y.)
**(Cite as: 2012 WL 3705009 (E.D.N.Y.))**

cumstances or particular episodes, and whether they allege excessive force or some other wrong."). The PLRA's administrative exhaustion requirement applies equally to *Bivens* claims, including but not limited to *Bivens* claims seeking monetary damages for allegedly negligent medical care that plaintiff received at the MDC. *See Williams v. Metro. Det. Ctr.,* 418 F.Supp.2d 96, 100–01 (E.D.N.Y.2005).

> FN7. The administrative exhaustion requirement of the PLRA exists to give " 'prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court[,]' and also creates an administrative record that facilitates judicial view." *Torres v. Anderson,* 674 F.Supp.2d 394, 397 (E.D.N.Y.2009) (quoting *Jones v. Bock,* 549 U.S. 199, 204, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) (citations omitted); *see Woodford v. Ngo,* 548 U.S. 81, 91 n. 2, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006) (noting the purpose of PLRA's administrative exhaustion requirement to be the prevention of "flood of prisoner litigation in the federal courts").

Because "[t]he exhaustion requirement covers all claims that an inmate might bring, ... [i]t follows that failure to exhaust prior to the commencement of a lawsuit requires dismissal of the prisoner's claim." *Torres v. Anderson,* 674 F.Supp.2d at 397 (citations omitted). "Courts must construe the exhaustion requirement strictly.... [A]n inmate can no longer claim that partial exhaustion of administrative remedies is sufficient because prison officials have notice of his claim." *Petrucelli v. Hasty,* 605 F.Supp.2d 410, 419 (E.D.N.Y.2009) (citations omitted).

To administratively exhaust claims under the PLRA, inmates at federal correctional facilities must seek formal review of their claims through a multi-step process known as the Administrative Remedy Program. *See* 28 C.F.R. §§ 542.10–542.19; Defs.' 56.1 Stmt. ¶ 178. First, an inmate must present a claim to BOP staff for informal resolution by filing an "Inmate Request for Informal Resolution", also known as a BP–8 form. *See* 28 C.F.R. § 542.13; Defs.' 56.1 Stmt. ¶¶ 182–84. Second, if the issue is not resolved informally or if a waiver for bypassing informal resolution is granted, the inmate must submit to the MDC Warden ("Warden") a "Request for Administrative Remedy", also known as a BP–9 form, within 20 calendar days of the event forming the basis for the Request. *See* 28 C.F.R. § 542.14(a); Defs.' 56.1 Stmt. ¶¶ 185–87. Third, if not satisfied with the Warden's response to the BP–9, the inmate can then appeal to the appropriate Regional Director by filing a "Regional Administrative Remedy Appeal", also known as a BP–10 form, within 20 calendar days of the date on the Warden's signed response to the BP–9. *See* 28 C.F.R. § 542.15(a); Defs.' 56.1 Stmt. ¶¶ 188–90. Fourth, a negative decision from the Regional Director may be appealed to the office of the General Counsel ("General Counsel" or "Central Office") by filing a "Central Office Administrative Remedy Appeal", or a BP–11 form, within 30 calendar days of the date on Regional Director's signed response to the BP–10. *See* 28 C.F.R. § 542.15(a); Defs.' 56.1 Stmt. ¶ 191. Inmates must use the appropriate form at each stage of administrative remedy appeal, and no claim is considered to have been fully exhausted under the Administrative Remedy Program until it has been considered by the General Counsel's office. *See* 28 C.F.R. §§ 542.14(a), 524.15(b); Defs.' 56.1 Stmt. ¶¶ 200–01.

**B. Plaintiff's Failure to Fully Exhaust Claim of Inadequate Medical Care for Shoulder Pain**

**\*7** Plaintiff initiated but did not complete the administrative remedy process for his *Bivens* claim of inadequate medical care for his left shoulder. This failure to fully exhaust administrative remedies as required by the PLRA requires dismissal of plaintiff's claim regarding medical treatment for his shoulder pain. *See Petrucelli,* 605 F.Supp.2d at 419 (inmate cannot claim that partial exhaustion of administrative

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

remedies is sufficient to satisfy the PLRA because prison officials have notice of his claim) (citing *Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007)).

In November 2009, plaintiff submitted a BP–8 for the claim of inadequate medical care regarding his left shoulder pain, and thereby initiated the administrative remedy process. Plaintiff stated on the BP–8 that his painkiller prescription had run out since receiving medical attention from the doctor back in August 2009. Although the BP–8 was dated November 12, 2009, MDC staff's written response on the BP–8 reflects that it was not received until November 24, 2009. (*See* Soloveichik Decl. Ex. B at 29.) On the very next day, November 25, 2009, plaintiff was seen by Dr. Borecky, who issued new painkiller prescriptions for plaintiff, requested an orthopedic consultation, and scheduled a follow-up visit for February 2010. (*Id.* at 30–32.)

If the response to the BP–8 did not resolve the issue and plaintiff wished to file a BP–9, he was required to submit one to the Warden within 20 calendar days of the conduct forming the basis of the BP–9. *See* 28 C.F.R. § 542.14(a); Defs.' 56.1 Stmt. ¶¶ 185–87. On January 26, 2010,[FN8] plaintiff filed a BP–9, stating that he had run out of pain medication and was still waiting for the orthopedic consultation that Dr. Borecky requested back in November 2009. (*See* Pltf. Resp., Ex. B.) The Warden rejected plaintiff's BP–9 as untimely on January 29, 2010.[FN9] (Defs.' 56.1 Stmt. ¶ 206.) On February 9, 2010,[FN10] plaintiff filed a BP–10 with the BOP Regional Director to appeal the Warden's rejection of his BP–9. (*See* Pltf. Resp., Ex. C.) On March 29, 2010, the BOP Regional Director rejected the BP–10 but instructed the Warden to address the BP–9's merits if plaintiff resubmitted it.[FN11] (Defs.' 56.1 Stmt. ¶¶ 208–09.) Instead of resubmitting the BP–9 to the Warden as instructed, however, on March 25, 2010 plaintiff filed a BP–11 to appeal the BOP Regional Director's rejection of the BP–10. (*See* Pltf. Resp., Ex. D.) On April 16, 2010, the General Counsel rejected the BP–11 and, like the BOP Re-

gional Director, instructed plaintiff in the rejection notice to resubmit his BP–9 so as to have its merits addressed by the Warden. (Defs.' 56.1 Stmt. ¶¶ 212–13.) Plaintiff never resubmitted his BP–9 to the Warden despite of having been twice instructed to do so.

FN8. Defendants state that according to records from BOP's computerized database SENTRY, plaintiff filed his BP–9 on January 29, 2010, three days after the date reflected on the copy of the BP–9 submitted by plaintiff. (*Compare* Defs.' 56.1 Stmt. ¶ 205 *with* Pltf. Resp., Ex. B.) Because the discrepancy is immaterial to any issue, the Court adopts the earlier filing date in a light more favorable to plaintiff.

FN9. An inmate's BP–9, BP–10, or BP–11 can be rejected, respectively, by the Warden, Regional Office, or Central Office without addressing the merits for failure to comply with the Administrative Remedy Program's procedural requirements. In such situations, the inmate would receive a rejection notice explaining the procedural defect and how to correct it if the defect is curable. *See* 28 C.F.R. §§ 542.14(a), (c), 542.15(b), 542.17(b); Defs.' 56.1 Stmt. ¶¶ 196–97.

FN10. Defendants state that according to records from BOP's computerized database SENTRY, plaintiff filed his BP–10 on February 16, 2010, one week after the date reflected on the copy of the BP–10 submitted by plaintiff. (*Compare* Defs.' 56.1 Stmt. ¶ 207 *with* Pltf. Resp., Ex. C.) Because the discrepancy is immaterial to any issue, the Court adopts the earlier filing date in a light more favorable to plaintiff.

FN11. When the MDC Warden rejects a

Not Reported in F.Supp.2d, 2012 WL 3705009 (E.D.N.Y.)
(Cite as: 2012 WL 3705009 (E.D.N.Y.))

BP–9 on grounds of procedural defect such as untimeliness and the inmate appeals, the Regional Director and/or General Counsel's Office may reject the appeal on grounds of the same defect or, in the alternative, direct the inmate to resubmit the BP–9 and the Warden to address the BP–9 on its merits upon resubmission. *See* 28 C.F.R. § 542.17(c); Defs.' 56.1 Stmt. ¶ 198.

By abandoning the administrative remedy process that he initiated, plaintiff has failed to fully exhaust administrative remedies regarding his left shoulder. *See Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007) (regardless of whether prisoner's informal complaints put the prison officials on notice of his grievance in a substantive sense, to satisfy the PLRA prisoner must also procedurally exhaust available administrative remedies); *McDowall v. MDC,* No. 08–CV–9329, 2010 WL 649744, at *5 (S.D.N.Y. Feb.22, 2010) (dismissing plaintiff's claim of deliberate indifference to medical needs for failure to exhaust where plaintiff voluntarily withdrew his BP–9 prior to BOP's decision on its merits). Administrative exhaustion is not complete until plaintiff resubmits his BP–9 to have its merits addressed by the Warden and fully appeals the Warden's response to the resubmitted BP–9 to both the Regional Director and the General Counsel's office. (Defs.' 56.1 Stmt. ¶¶ 198–200.)

**\*8** Plaintiff claims he was prevented from resubmitting his BP–9 to the Warden because defendant Counselor Edwards refused to take the second BP–9 and plaintiff had no other way of resubmitting the BP–9 except through Counselor Edwards. (*See* Pltf. Resp. at 2–3.) However, such unsworn, conclusory statements about a MDC staff member's obstruction of plaintiff's utilization of the grievance process are insufficient to raise a genuine dispute of material fact. *See Mitchell v. Senkowski,* No. 04–1792, 158 Fed. Appx. 346, at 350 (2d Cir.2005) ("Appellant's conclusory assertion that prison officials obstructed his utilization of the grievance process is insufficient to

raise a genuine dispute of material fact that would defeat summary judgment."). In any case, plaintiff claims only that he attempted to resubmit his BP–9 after being instructed to do so by the Central Office, but does not satisfactorily explain why he failed to resubmit his BP–9 after first being instructed to do so by the Regional Director.[FN12] Moreover, plaintiff fails to explain why he could not seek the assistance of other MDC staff members on his unit team for the resubmission of his BP–9. In his response to defendants' motion, plaintiff mentions that he received assistance from his case manager during the administrative appeal process when the case manager attempted to contact the Regional Director's office. (*See* Pltf. Resp. at 3.) Furthermore, the record reflects, and plaintiff does not dispute, that MDC inmates who were assigned to defendant Counselor Edwards could also seek assistance from Counselor Gail McMillan, who shared an office with Edwards and often helped inmates assigned to Edwards if they came to the office with questions while Edwards was out of the office. (Defs.' Reply 56.1 Stmt. (Doc. No. 32) ¶¶ 171–73.) Thus, plaintiff has neither established that defendant Counselor Edwards was plaintiff's only avenue for BP–9 resubmission, nor explained why he could not have sought the assistance of another counselor or MDC staff member on his unit team to resubmit the BP–9. Accordingly, plaintiff's *Bivens* claim regarding his left shoulder must be dismissed for failure to fully exhaust administrative remedies under the PLRA.

> FN12. Plaintiff states that after the Regional Director's office instructed him to resubmit his BP–9 to the Warden and plaintiff's "unit team to contact the region," plaintiff's case manager attempted to contact the Regional Director's office but to no avail. (*See* Pltf. Resp. at 2–3.) However, this fails to explain why plaintiff did not resubmit a BP–9 to the Warden as instructed by the Regional office before appealing the Region Director's decision to the Central Office.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3705009 (E.D.N.Y.)
**(Cite as: 2012 WL 3705009 (E.D.N.Y.))**

Plaintiff cites *Martinez v. Weir,* No. 00–CV–1140 (DJS), 2006 WL 2884775 (D.Conn. Oct.10, 2006) in support of the position that the Court must deny summary judgment to defendants when plaintiff has provided evidence of attempting to exhaust administrative remedies prior to filing his action in court. (*See* Pltf. Resp. at 4.) The facts in *Martinez* are inapposite. In *Martinez,* the court found that "plaintiff has provided evidence that he attempted to exhaust his administrative remedies ... twice prior to filing" the lawsuit and followed prison officials' instruction to re-file a level 1 grievance after being informed that there was no record of the original level 1 grievance filed by the plaintiff. 2006 WL 2884775, at *5. Here, plaintiff was given two opportunities to refile his BP–9 and failed to avail himself of either one. As such, his claims are barred for failure to exhaust his administrative remedies.

**C. Plaintiff's Failure to Administratively Exhaust Claims of Inadequate Medical Care for Neck and Back Injuries**

**\*9** The only BP forms filed by plaintiff are with regard to medical treatment of his left shoulder but make no mention of neck or back injuries. (*See* Pltf. Resp. (Doc. No. 22), Exs. A–D; Defs.' 56.1 Stmt. ¶¶ 203–11.) Plaintiff does not appear to have filed a BP–9 (Request for Administrative Remedy), let alone a BP–10 (Regional Administrative Remedy Appeal) or a BP–11 (Central Office Administrative Remedy Appeal), to exhaust claims of inadequate medical care for his neck and back injuries. (*See* Defs.' 56.1 Stmt. ¶ 202.) Accordingly, plaintiff's *Bivens* claim of inadequate medical care for his neck and back injuries must be dismissed for failure to exhaust administrative remedies as required by the PLRA. *See, e.g., McDowall v. MDC,* No. 09–CV–0695, 2010 WL 3521879, at *2 (E.D.N.Y. Aug. 31, 2010) (dismissing *pro se* plaintiff inmate's *Bivens* claim for failure to file a BP–9, BP–10, and BP–11). Plainitff's *pro se* status does not change the result. *See, e.g., Houze v. Segarra,* 217 F.Supp.2d 394, 395–96 (S.D.N.Y.2002) (dismissing prisoner's complaint for failure to exhaust

administrative remedies as required by PLRA after acknowledging that his *pro se* status is generally accorded leniency).

Plaintiff attempts to rely on the same conclusory allegations that certain individuals "conspired and acted in concert with one another as confederates to deny the plaintiff the ability to exhaust his administrative remedy process by refusing to accept the plaintiff's forms, thereby preventing the plaintiff from going anywhere on the administrative ladder." (*See* Compl. Addendum ¶ 14.) However, nowhere does plaintiff explain what prevented him from mentioning neck and back injuries, allegedly all caused by the same fall in the MDC shower, on the same BP–8, BP–9, BP–10, and BP–11 forms that he filed seeking medical treatment for his left shoulder pain. In short, plaintiff has provided no expalnation for his abandonment of the MDC's administrative review process before bringing his claims of inadequate medical care for neck and back injuries in federal court.

**III. *BIVENS* CLAIMS OF INADEQUATE MEDICAL CARE REQUIRE DISMISSAL AS A MATTER OF LAW**

Plaintiff's *Bivens* claims of inadequate medical care, besides failing the PLRA's requirement for administrative exhaustion, also warrant dismissal as a matter of law. Plaintiff makes the following allegations against individual defendants: (1) from April 2009 to January 2011, defendants Dynan, Marousis–Bush, Ittayem, Georgy, and Dr. Newland were informed on numerous occasions of plaintiff's medical needs and told "plaintiff that they would get back to him" but never did, (Compl. Addendum ¶ 8); (2) the aforementioned defendants as well as defendant Dr. Borecky were "deliberately indifferent to the plaintiff's medical needs when they would let the plaintiff run out of pain medication" and then tell plaintiff that he needed to buy his own pain medication from the prison commissary, (*id.* ¶ 12); (3) defendant Dr. Borecky refused to perform an MRI scan and other forms of treatment when he saw plaintiff because BOP

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3705009 (E.D.N.Y.)
(Cite as: 2012 WL 3705009 (E.D.N.Y.))

policy only allows treatment for one injury at a time, and told plaintiff that "his other injuries would have to wait" while the injury to his shoulder was being treated, (*id.* ¶ 13); (4) plaintiff was in extreme pain but was denied access to the Medical Department when defendant Counselor Edwards, refusing to contact the Medical Department on plaintiff's behalf, allegedly told plaintiff that "pre-trial inmates are of no great concern here at MDC–Brooklyn. You'll have to just keep filing requests. Now get out of my office," (*id.* ¶ 6); (5) defendant Counselor Edwards interfered with the processing of paperwork requesting a medically authorized two-piece jump suit uniform for plaintiff because "he did not believe that a two piece uniform was medically necessary," thereby causing a delay that inflicted extreme pain upon plaintiff while he struggled to get in and out of his regular one-piece jump suit, (*id.* ¶ 11).

## A. Legal Standard Governing *Bivens* Claims of Inadequate Medical Care

**\*10** Because at the time of the alleged conduct, plaintiff was not a convicted federal prisoner but a pre-trial detainee held in a federal facility, his *Bivens* claims of inadequate medical care should not be assessed under the Eighth amendment as characterized by plaintiff (*See* Compl. Addendum ¶¶ 5–8) but rather, under the Fifth Amendment's Due Process Clause. *See Cuoco v. Moritsugu,* 222 F.3d 99, 106 (2d Cir.2000). This distinction is not significant, however, since the analysis of a pre-trial federal detainee's claim of deliberate indifference to his medical needs under the Due Process Clause of the Fifth Amendment is the same as that for a convicted federal inmate under the Eighth Amendment. *Id.*

To establish a claim of inadequate medical care, plaintiff must establish that he had a "serious medical need" and that defendants showed "deliberate indifference" to that need. *Smith v. Carpenter,* 316 F.3d 178, 183 (2d Cir.2003); *see Farmer v. Brennan,* 511 U.S. 825, 834–35, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The first element of "serious medical need" is

an objective one and requires that "the alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration or extreme pain exists." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) (internal quotation marks and citation omitted). Where the basis of an inmate's claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, rather than prison official(s)'s failure to provide medical treatment altogether, the seriousness inquiry focuses on "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract." *Carpenter,* 316 F.3d at 185–86 (internal quotation marks omitted). In any event, "a prisoner does not have the right to choose his medical treatment as long as he receives adequate treatment." *Hill v. Curcione,* 657 F.3d 116, 123 (2d Cir.2011).

"Deliberate indifference," the second and subjective element of a *Bivens* claim of inadequate medical care, measures whether prisoner officials acted with "a sufficiently culpable state of mind." *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir.2006) (citing *Wilson v. Seiter,* 501 U.S. 294, 300, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). To prove this element, plaintiff must show that "the charged official act[ed] or fail[ed] to act while actually aware of a substantial risk that serious inmate harm will result.... The reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result. Rather, proof of awareness of a substantial risk of the harm suffices." *Salahuddin,* 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 836–37, 842). A showing of the subjective "deliberate indifference" element "requires more than negligence, but less than conduct undertaken for the very purpose of causing harm." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citing *Farmer,* 511 U.S. at 826). That is, the "deliberate indifference" prong requires plaintiff to show that a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3705009 (E.D.N.Y.)
**(Cite as: 2012 WL 3705009 (E.D.N.Y.))**

be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Hathaway v. Coughlin,* 37 F.3d at 66 (quoting *Farmer,* 511 U.S. at 837).

## B. Plaintiff Cannot Sufficiently Show Objective Element of "Serious Medical Need"

**\*11** The record is clear that plaintiff received on-going treatment for his shoulder pain and then later for his back and neck pains from August 2009 to August 2011. (*See* Defs.' 56.1 Stmt. ¶¶ 74–151; Pltf. Resp. at 7.) The on-going treatment consisted of the following: (1) physical examinations and post-consultation visits with the MDC medical staff, (Defs.' 56.1 Stmt. ¶¶ 75, 90, 104, 111, 113, 121, 125, 135, 137, 148); (2) multiple pain medication prescriptions from August 2009 through June 2011, (*id.* ¶¶ 79, 93, 102, 116, 129, 135, 140); (3) x-rays taken of plaintiff's left shoulder in August 2009 and December 2010, and of his neck and back in May 2011, (*id.* ¶¶ 81, 120, 136); 4) consultations with an orthopedic surgeon at New York Downtown Hospital in Feburary 2010 and March 2011, (*id.* ¶¶ 103, 130); (4) a consultation with a rehabilitation specialist to deteremine the appropriate course of physical therapy in April 201, (*id.* ¶ 134); and 5) three session of physical therapy at a facility outside the MDC in June 2011, (*see id.* ¶¶ 143, 144, 147.)

Given the on-going nature of plaintiff's medical treatment at the MDC, the "serious medical need" inquiry need only focus on the risk of harm faced by plaintiff due to the alleged delays in the provision of medical care by individual defendants. *See Carpenter,* 316 F.3d at 183–84. However, accepting plaintiff's allegations as true and drawing all reasonable inferences in his favor, plaintiff has not satisfied the objective seriousness inquiry. After a combination of repeated medical appointments, analgesic prescriptions, radiology tests and other specialists' consultations, all spanning a two-year period, the ultimate recommendation for defendant's continued course of

treatment was that plaintiff undergo physical therapy. (Defs.' 56.1 Stmt. ¶¶ 130–31, 134, 144, 147.) And it is undisputed that plaintiff refused such therapy, even though plaintiff was advised that his physical condition might not improve if he persisted in his refusal. (*Id.* ¶ 150, 154–56.) Having received two years of ongoing evaluation and treatment, culminating in a plan of treatment that plaintiff rejected, plaintiff cannot plausibly suggest that any harm has been caused by defendants' purported delays. Indeed, plaintiff does not point to any such harm, but merely makes the circular assertion that the alleged delays in treatment "held up" his treatment. *See* Comp .l. Add'm ¶ 9. Thus, plaintiff fails to plead a sufficiently serious medical need.

## C. Plaintiff Fails to Show Subjective Element of "Deliberate Indifference" by Any Individual Defendant

Even if he has established a plausible and sufficiently serious medical need, Plaintiff has failed to show the second element of his *Bivens* claims, namely that any individual defendant was deliberately indifferent.

### 1. Insufficient Showing of Deliberate Indifference by Individual Defendants Dr. Newland, Dynan, Marousis–Bush, Ittayem, and Georgy for Alleged Promise and Failure to Respond to Plaintiff's Medical Needs

**\*12** Plaintiff claims that from April 2009 to January 2011, defendants Associate Warden Dynan, Health Services Administrator Georgy, Assistant Health Services Administrator Ittayem, Health Services Administrative Assistant Marousis–Bush, and Dr. Newland were informed on numerous occasions of plaintiff's medical needs but, despite promising plaintiff that they would address the issue and get back to him, failed to do so. (*See* Compl. Addendum ¶ 8.)

As an initial matter, conclusory allegations that defendants were aware of plaintiff's medical needs and chronic pain but failed to respond are generally not

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3705009 (E.D.N.Y.)
**(Cite as: 2012 WL 3705009 (E.D.N.Y.))**

sufficient proof of defendants' deliberate indifference and cannot survive a Rule 12(b)(6) motion to dismiss. *See, e.g., Adekoya v. Holder,* 751 F.Supp.2d 688, 691, 697 (S.D.N.Y.2010) (finding conclusory allegations that medical staff defendants were aware of plaintiff's medical needs and failed to provide adequate care to be insufficient in defeating a motion to dismiss *Bivens* claim of inadequate medical care).

Even assuming *arguendo* that plaintiff's conclusory allegations are true, Dr. Newland, could not have shown deliberate indifference to plaintiff's serious medical needs by failing to respond to plaintiff's various verbal inquiries from April 2009 to January 2011, since he was not working at the MDC during this time. Defendant Dr. Newland left the MDC in March 2009 for another job position within the BOP and did not return to the MDC's medical staff until January 2011. (Defs.' 56.1 Stmt. ¶¶ 35–37.)

Claims against defendants Dynan, Georgy, and Marousis–Bush fare no better. *See, e.g.,* As the Court previously explained, the "serious medical need" inquiry, and by inference the corresponding "deliberative indifference" inquiry, needs to focus only on the alleged *delays* in plaintiff's on-going medical treatment. Plaintiff has identified two such delays: 1) the five-month delay between sustaining injury and receiving medical attention in August 2009, and 2) the three-month delay between the August 2009 medical appointment and November 2009 referral for an orthopedic consultation. The record reflects, and plaintiff does not dispute, that defendants Dynan, Georgy, and Marousis–Bush did not join the MDC staff until November 2010, January 2010, and April 2010 respectively. (*See* Defs.' Reply 56.1 Stmt. ¶¶ 13, 22, 32.) Plaintiff does not explain what role did any individual defendant play in causing the two alleged delays, which took place in 2009, in plaintiff's medical treatment. As such, these defendants cannot be said to have been deliberately indifferent when they did not participate in the treatment of which plaintiff complains. *See Gray v. Metropolitan Detention Center,* No. 09–CV–4520(KAM)(LB), 2011 WL 2847430, at *1, 11 (E.D.N.Y. July 15, 2011) (conclusory allegations that plaintiff reported his medical situation to individual defendants without establishing that individual defendants had any role in plaintiff's medical care did not establish that defendants acted with deliberate indifference to plaintiff's serious medical needs).

**\*13** Moreover, Marousis–Bush and defendant Assistant Health Services Administrator Ittayem performed administrative duties at the MDC's Medical Department, including tasks such as budgeting and supervising responses to administrative remedy requests regarding medical care. They are not MDC medical providers and do not provide medical care to inmates. (*See* Defs.' 56.1 Stmt. ¶¶ 28–29.) And plaintiff fails to explain what role they could have played in causing or expediting delays in plaintiff's medical treatment. Thus, from the facts alleged, they cannot be said plausibly to have been deliberately indifferent to plaintiff's medical needs.

**2. Insufficient Showing of Deliberate Indifference by Individual Defendants Dr. Borecky, Dr. Newland, Dynan, Marousis–Bush, Ittayem, and Georgy for Allegedly Telling Plaintiff to Purchase Pain Medication from Commissary**

Plaintiff claims that defendants Dr. Borecky, Dr. Newland, Dynan, Marousis–Bush, Ittayem, and Georgy were "deliberately indifferent to the plaintiff's medical needs when they would let the plaintiff run out of pain medication" and then tell plaintiff that he needed to buy his own pain medication from the prison commissary. (*See* Compl. Addendum ¶ 12.) According to plaintiff, this caused him to "suffer unbearably" because BOP policy limited medication purchases from the commissary to one bottle per order and no more than once every two weeks,[FN13] which did not meet plaintiff's dosage requirements for pain medication. (*See* Compl. Addendum ¶ 12.) Plaintiff's claim, in essence, appears to be that individual defendants should have increased the dosage and/or

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

duration of his prescriptions.

> FN13. The quantity limitation to MDC inmates' purchases of over-the-counter analgesics from the prison commissar, it is in place to protect the health of inmates, presumably from potential consequences like medication overdoses. (*See* Defs.' 56.1 Stmt. ¶ 51; Decl. of Michael Borecky ("Borecky Decl.") (Doc. No. 28, Attach.6) ¶ 5.)

The aforementioned individual defendants' alleged advice for plaintiff to purchase mediation from the commissary once his prescription medication ran out, even if true, does not show that they "knew of and disregarded an excessive risk" to plaintiff's health. *Hathaway,* 37 F.3d at 67. To the extent that plaintiff is challenging the dosage level or duration of his prescription pain medication as insufficient, his claim of deliberate indifference by individual defendants fails because plaintiff does not allege that any individual defendant prescribed medication to plaintiff with the requisite culpable state of mind. *See Lopez v. City of New York,* No. 05 Civ. 10321(NRB), 2009 WL 229956, at *11 (S.D.N.Y. Jan.30, 2009) (dismissing inmate's challenge of prescription dose level's adequacy for lack of medical testimony supporting such challenge and for lack of evidence that prison doctors prescribed said dosage with requisite awareness and disregard of excessive risk to inmate safety).

As an initial matter, plaintiff's claim against defendants Dynan, Marousis–Bush, Ittayem, and Georgy must be dismissed because they are not MDC medical providers and have no control over the dosage level and duration of medical prescriptions to inmates. (*See* Defs.' 56.1 Stmt. ¶¶ 15, 24, 29, 33.) As for defendant Dr. Borecky, who ceased being plaintiff's assigned treating physician after August 2009, the only pain medication that Dr. Borecky prescribed and could have been deliberately indifferent to plaintiff for its dosage level or prescribed duration was the acetaminophen prescribed on August 14, 2009 (*See*

Soloveichik Decl. Ex. B at 25–26), when Dr. Borecky was presumably still plaintiff's assigned treating physician.[FN14] *See Cuoco,* 222 F.3d at 11 (prison doctor's refusal to intervene in the medical treatment of a patient not assigned to him, despite ability to prescribe medication and inmate's demand for prescription, was objectively reasonable as matter of law). The August 14, 2009 acetaminophen prescription was for fifteen days, putting the earliest time where plaintiff could have run out of pain medication at late August or early September 2009. By this time, however, Dr. Borecky was no longer plaintiff's assigned treating physician and therefore, as a matter of law, could no longer be liable for deliberate indifference toward plaintiff's medical needs.

> FN14. Defendant Dr. Borecky was plaintiff's assigned treating physician only from February until sometime in August 2009, when Dr. Jusayan took over the responsibility. Upon Dr. Jusayan's departure from the MDC around March 2010, Dr. Borecky along with other medical providers filled in at medical appointments for inmates like plaintiff who had Dr. Jusayan as their assigned treating physician. In early 2011, defendant Dr. Newland became plaintiff's assigned treating physician when he joined the MDC medical staff. (*See* Defs.' 56.1 Stmt. ¶¶ 62–65.) In light of this timeline, the only pain medication for which Dr. Borecky could be potentially liable for the dosage level and prescribed duration is the acetaminophen oral tablets prescribed on August 14, 2009, when Dr. Borecky was presumably still plaintiff's assigned treating physician. (*See* Soloveichik Decl. Ex. B at 25–26.)

**\*14** Similarly, remaining defendant Dr. Newland could not be capable of deliberate indifference toward plaintiff until he became plaintiff's assigned treating physician upon his January 2011 arrival at the MDC. Dr. Newland first saw plaintiff on a medical visit on

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3705009 (E.D.N.Y.)
**(Cite as: 2012 WL 3705009 (E.D.N.Y.))**

February 2, 2011, issued plaintiff pain medication prescription on that visit, and again issued another prescription following a June 2011 visit, with each prescription lasting for a duration of six months. (*See* Defs.' 56.1 Stmt. ¶¶ 125, 129, 137, 140.) Filed on February 15, 2011, plaintiff's complaint about Dr. Newland's failure to intervene after plaintiff ran out of pain medications is simply contradictory to plaintiff's medical records.

For the reasons above, plaintiff has failed to show that any individual defendant was deliberately indifferent to the plaintiff's medical needs by directing him to buy his own pain medication from the prison commissary after he ran out of prescribed pain medication.

3. **Insufficient Showing of Deliberate Indifference by Individual Defendant Dr. Borecky for Allegedly Refusing to Treat More than One Injury at a Time**

Plaintiff claims that defendant Dr. Borecky refused to perform an MRI scan or other forms of treatment when he saw plaintiff because BOP policy only allows treatment for one injury at a time, and told plaintiff that "his other injuries would have to wait" while his shoulder injury was being treated. (*See* Compl. Addendum ¶ 13.) Contrary to this assertion, plaintiff's medical records show that on each of his visits with Dr. Borecky, he was treated and/or prescribed medication for other ailment(s) in addition to his shoulder injury. For example, Dr. Borecky treated plaintiff for chronic conditions like diabetes, esophageal reflux, and hyperlipidemia in addition to shoulder pain during both the August 14, 2009 visit and the November 16, 2010 visit. (Soloveichik Decl. Ex. B at 25, 55.) On April 18, 2011, Dr. Borecky treated plaintiff for shoulder, neck, and lower back pains. (*Id.* at 73.)

Plaintiff's allegation regarding Dr. Borecky's failure to prescribe an MRI scan is without merit as well. The MRI of plaintiff's shoulder that Dr. Jusayan requested in February 2010 was, as a matter of fact, recommended by the very orthopedic specialist with whom Dr. Borecky requested a consultation for plaintiff in November 2009. (*See* Defs.' 56.1 Stmt. ¶¶ 94, 103–05.) Plaintiff's claim, in essence, appears to be the following: Dr. Borecky's failure to *immediately* request an MRI scan when he treated plaintiff in August 2009 and then again in November 2009 constituted deliberate indifference to plaintiff's medical needs. However, a medical judgment is not deliberate indifference just because it is not the inmate's preferred course of treatment. "Whether to order an MRI or similar diagnostic treatments is a classic example of a matter for medical judgment,' and where the treatment provided is responsive to the prisoner's condition, ... the fact that a prisoner might prefer different treatment does not give rise to" a Constitutional violation. *Victor v. Milicevic,* 361 Fed. Appx. 212, 215 (2d Cir.2010) (internal quotation marks and citations omitted). Medical records demonstrate that Dr. Borecky took specific actions, in addition to prescribing medications, as a response to plaintiff's complaints of shoulder pain. In fact, following the August 14, 2009 visit, Dr. Borecky ordered x-rays to be taken of plaintiff's shoulder, and said order was executed roughly two weeks later. (Soloveichik Decl. Ex. B at 26, 28.) Also, following the November 25, 2009 visit, Dr. Borecky requested an orthopedic consultation that eventually led to an MRI scan of plaintiff's shoulder. (*See id.* at 32.)

**\*15** For these reasons, plaintiff has failed to show that defendant Dr. Borecky was deliberately indifferent to the plaintiff's medical needs by refusing to perform an MRI scan and allegedly telling plaintiff that "his other injuries would have to wait" while the injury to his shoulder was being treated.

4. **Insufficient Showing of Deliberate Indifference by Individual Defendant Edwards for Allegedly Refusing to Contact Medical Department on Plaintiff's Behalf**

Plaintiff's first allegation against defendant Edwards is that at some point between his March 2009

injury and August 2009 treatment, Edwards refused to help plaintiff in getting medical attention, instead telling him "[y]ou'll have to just keep filing requests" because pre-trial MDC inmates' medical needs were not important. (*See* Compl. Addendum ¶ 6.)

However, the record reflects that the undisputed primary means for an inmate to obtain medical care is not through his assigned counselor, but by filling out a sick call sheet and placing it in the sick call box to notify medical personnel that he would like to request an appointment, as described in the Admission and Orientation Manual. (*See* Defs.' Reply 56.1 Stmt. ¶ 40.) An inmate can obtain blank sick call sheets from any member of his unit team, such as his counselor, case manager, or unit manager. (*See id.* ¶ 41.) Under the "Emergency Sick Calls" heading of the Admission and Orientation Manual, inmates are advised that if they require medical attention after regular sick call hours or on weekends and holidays, they could ask the unit officer or work detail supervisor to contact health services, which would in turn honor the request if the physician feels immediate medical attention is necessary in a particular inmate's case. (*See id.* ¶ 42.) If unsuccessful, the Admission and Orientation Manual instructs that an inmate can then submit written requests to a staff member detailing the need for appropriate medical care and, if still dissatisfied, initiate the aforementioned multi-step Administrative Remedy Program. (*See id.* ¶¶ 44–46.)

Drawing all reasonable inferences in plaintiff's favor, plaintiff's allegations against defendant Edwards fail to establish that Edwards was deliberately indifferent. Edwards' alleged refusal to help plaintiff secure a medical appointment and instruction for plaintiff to "keep filing requests" (Compl. Addendum ¶ 11), while less than courteous in tone, does not deviate from the procedures for inmates seeking medical attention as set forth in the Admission and Orientation Manual for MDC inmates. Such compliance with MDC procedures does not constitute deliberate indifference on Edwards' part. *See Demartino,* 2006 WL

1455456, at *8 (allegation that MDC unit manager did nothing to help plaintiff inmate get medical attention and told plaintiff to be patient because understaffed MDC medical department "could take as long as they want" fails to establish unit manager was aware of and ignored substantial risk of serious harm to plaintiff).

**\*16** Plaintiff's BP–8 filing initiated the administrative remedy process in November 2009 seeking resolution for his shoulder pain, implying that he received a copy of the Admission and Orientation Manual or, at the very least, was familiar with the Manual's procedures for MDC inmates seeking medical attention. (*See* Defs .' Reply 56.1 Stmt. ¶ 203.) Furthermore, plaintiff does not allege that defendant Edwards interfered with plaintiff's ability to utilize these MDC procedures by, for example, denying plaintiff the use of blank sick call sheets to fill out additional medical appointment requests, or refusing to make emergency sick calls on plaintiff's behalf to health services after regular sick call hours or on weekends and holidays.

In short, defendant Edwards' alleged refusal to help plaintiff secure a medical appointment and instruction for plaintiff to "keep filing requests" did not constitute deliberate indifference, as it was in compliance with standard procedures for MDC inmates seeking medical attention.

### 5. Claim Against Individual Defendant Edwards for Causing Delay in Issuance of Two–Piece Prison Jumpsuit Uniform Sufficiently Shows Deliberates Indifference But Requires Dismissal for Lack of Administrative Exhaustion

Plaintiff's second allegation against defendant Edwards is that he knowingly caused a delay in the processing of paperwork requesting a medically authorized two-piece prison jumpsuit uniform for plaintiff, thereby inflicting extreme pain upon plaintiff while he struggled to get in and out of his regular one-piece jump suit. (Compl. Addendum ¶ 11.)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3705009 (E.D.N.Y.)
**(Cite as: 2012 WL 3705009 (E.D.N.Y.))**

To obtain a two-piece jumpsuit, an inmate must obtain a medical authorization and bring it to a counselor; the counselor, in turn, will sign and date a Laundry Clothing Issue and Exchange Form, staple the medical authorization to said Form, and submit the Form to the laundry unit, which will distribute the new uniform to the inmate. (Defs.' 56.1 Stmt. ¶¶ 168–69.) Plaintiff claims that he did not receive his medically authorized two-piece jumpsuit until approximately seven weeks after the authorization was issued on February 17, 2010, which subjected him to extreme pain in the interim and forced him to defecate in his clothing at times, and that defendant Counselor Edwards knowingly caused this delay.

However, it is undisputed that at the time of events giving rise to the present action, Edwards shared an office with Counselor Gail McMillan, and the two counselors were in the habit of helping inmates on each other's caseload depending on who was in the office when an inmate came with a question. (Defs.' Reply 56.1 Stmt. ¶ 171.) Medical records and Counselor McMillan's affidavit reflect that on April 5, 2010, plaintiff brought the medical authorization for a two-piece jumpsuit dated February 17, 2010 to the shared office of Counselors McMillan and Edwards. Because plaintiff's assigned counselor, defendant Edwards, was not in the office at the time, Counselor McMillan helped plaintiff. (*Id.* ¶¶ 172–73.) Counselor McMillan states in her affidavit that, consistent with her practice in the past, she completed a Laundry Clothing Issue and Exchange Form that same day, and stapled a copy of plaintiff's medical authorization to the Form. (*Id.* ¶¶ 170, 174; *see* McMillan Decl. (Doc. No. 28, Attach.8) ¶¶ 11, 12 & Ex. 1.) Plaintiff admits that he received the two-piece jumpsuit shortly after Counselor McMillan's processing of the authorization on April 5, 2010. (*See* Compl. Addendum ¶ 11.)[FN15]

FN15. Moreover, plaintiff has not administratively exhausted his claim, as required by the PLRA, against defendant Edwards re-

garding this particular claim. Said defect is ground for dismissal, without prejudice, of the claim against Edwards regarding his allegedly knowing delay in processing plaintiff's medically authorization for a two-piece jumpsuit. *See, e.g., Henry v. Nassau Univ. Med. Ctr.,* No. 06–CV–6867 (JS)(ETB), 2008 WL 638246, at *3 (S.D.N.Y. July 22, 2011)* (dismissing inmate's deliberate indifference claim without prejudice for failure to exhaust administrative remedies as required by PLRA).

## IV. PLAINTIFF'S REQUEST FOR DISCOVERY IS DENIED

**\*17** Plaintiff requests the Court to deny defendants' pre-discovery motion and allow plaintiff to conduct discovery in order to oppose the motion. (*See* Pltf. Resp. at 10–11.) The Court interprets plaintiff's request as an application for discovery under Fed.R.Civ.P. 56(d).[FN16] A party resisting summary judgment and requesting Rule 56(d) discovery must submit an affidavit showing "(1) what facts are sought to resist the motion and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort the affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." *Alcantara v. City of New York,* 646 F.Supp.2d 449, 463 (S.D.N.Y.2009) (citations omitted).

FN16. Fed.R.Civ.P. 56(d) was formerly Fed.R.Civ.P. 56(f), which plaintiff cites in his response to defendants' motion, (*See* Pltf. Resp. at 10–11), before being recodified in 2010 with no substantial changes.

As an initial matter, plaintiff has failed to submit such an affidavit, despite having been served with a Notice to *Pro Se* Litigant Opposing Motion To Dismiss or Motion For Summary Judgment, which attached Fed.R.Civ.P. 56(d) and set forth the requirement for an affidavit supporting a Rule 56(d) discov-

Not Reported in F.Supp.2d, 2012 WL 3705009 (E.D.N.Y.)
**(Cite as: 2012 WL 3705009 (E.D.N.Y.))**

ery request. (*See* September 2, 2011 Letter to Plaintiff (Doc. No. 19).) Plaintiff's failure to submit an affidavit under Rule 56(d) is sufficient grounds for denying his discovery request. *See, e.g., Capital Partners v. Alternative Constr. Tech.,* 638 F.Supp.2d 360 (S.D.N.Y.2009) (citing *Di Benedetto v. Pan Am World Service, Inc.,* 359 F.3d 627, 630 (2d Cir.2004)).

Even setting aside plaintiff's failure to submit an affidavit, he has not described any of the following four categories of information requisite to this Court's permission to conduct Rule 56(d) discovery: the specific facts he seeks to discover, how he expects these facts to create a genuine issue of material fact, what efforts he has made to obtain these facts, and why these efforts failed. *See Alcantara,* 646 F.Supp.2d at 463. On the contrary, plaintiff only states in general, conclusory terms that "plaintiff has not been given his medical records" and "needs to conduct discovery to obtain factual information to further oppose defendants['] motion." (Pltf. Resp. at 11.) However, "a bare assertion that the evidence supporting a plaintiff's allegation is in the hands of the defendant is insufficient to justify a denial of a motion for summary judgment under Rule 56(f) [now recodified as Rule 56(d) ]." *Paddington Partners v. Bouchard,* 34 F.3d 1132, 1138 (2d Cir.1994) (internal quotation makrs and citations omitted); *accord Aguiar v. Lindsay,* Nos. 07–CV–3104 (DLI)(LB), 07–CV–3140 (DLI)(LB), 07–CV–3141 (DLI)(LB), 08–CV–03311 (DLI) (LB), 2010 WL 1286217, at *7 (E.D.N.Y. Mar. 31, 2010). For the reasons above, the Court denies plaintiff's rule 56(d) application for discovery.

### CONCLUSION

For the reasons stated herein, defendants' motion to dismiss or in the alternative for summary judgment (Doc. No. 24) is granted, and this action is dismissed. The Clerk of Court shall enter judgment accordingly, mail a copy of this Memorandum and Order to plaintiff *pro se,* and close this case.

**\*18** The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that appeal would not be taken in good faith and therefore *in forma pauperis* status is denied for the purpose of any appeal. *Coppedge v. United States,* 369 U.S. 438, 444–45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

SO ORDERED.

E.D.N.Y.,2012.
Gumbs v. Dynan
Not Reported in F.Supp.2d, 2012 WL 3705009 (E.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4863161 (E.D.N.Y.)
**(Cite as: 2012 WL 4863161 (E.D.N.Y.))**



Only the Westlaw citation is currently available.NOT FOR PUBLICATION

United States District Court,
E.D. New York.
Ervin B. ROGERS, Plaintiff,
v.
NEW YORK CITY POLICE DEPARTMENT; New York District Attorneys Office; and John Doe, Shield # 1275, 67th Precinct, Defendants.

No. 12 CV 3042(CBA)(MG).
Oct. 12, 2012.

Ervin B. Rogers, East Elmhurst, NY, pro se.

### MEMORANDUM & ORDER

AMON, Chief Judge.

**\*1** Plaintiff Ervin B. Rogers, then detained at Rikers Island, brought this *pro se* civil rights action pursuant to 42 U.S.C. § 1983 on June 13, 2012. Plaintiff's application to proceed *in forma pauperis* is granted pursuant to 28 U.S.C. § 1915. The New York City Police Department ("N.Y.P.D."), and the District Attorney's Office FN1 are dismissed as defendants. Plaintiff's claims against the officer identified as defendant John Doe, Shield # 1275, may proceed.

> FN1. Although plaintiff names the "New York District Attorneys Office," he gives the address for the Kings County District Attorney, located in Brooklyn. As the incidents are alleged to have occurred in Brooklyn, the Court surmises that plaintiff means to name the Kings County District Attorney and not the New York County District Attorney located in Manhattan.

### BACKGROUND

Plaintiff alleges that he was in his apartment at 1605 Nostrand Avenue on May 31, 2012, when he called 9–1–1 and asked to have a "guest" removed from his apartment. (Complaint at 3.) FN2 He states that he began to experience chest pains and took a nitroglycerin pill. (*Id.*) The police called EMTs, who placed plaintiff in an ambulance. (*Id.*) Plaintiff states that he began to feel better, so he left the ambulance and returned to his apartment. (*Id.*) Shortly thereafter, he left the building, and as he was walking back to his apartment, he was approached by a police vehicle. (*Id.* at 3, 4) According to plaintiff, the officer, identified as Shield # 1275, asked plaintiff to come to his car, and plaintiff refused. (*Id.*) The officer then exited his vehicle and told plaintiff to turn around and place his hands on a gate. (*Id.* at 4.) When plaintiff questioned the officer's instructions, the officer put him in a head lock, while another officer hit him in the head. (*Id.*) Plaintiff claims that he then passed out. (*Id.*). After he regained consciousness, plaintiff was handcuffed and taken to the police station. (*Id.*) Plaintiff claims that Officer # 1275 held his cuffed hands in an uncomfortable position. (*Id.*). Plaintiff also alleges that he informed the officers that he suffered from congestive heart failure, but they ignored his repeated requests for medical attention. (*Id.* at 4–5.) Plaintiff alleges that he passed out a second time and awoke in a cell. (*Id.* at 5.) Shortly thereafter, plaintiff was taken to Kings County Hospital Center, where he was examined for his chest pains, but "not the injurise [*sic* ] I suffered at the hand of Officer # 1275." (*Id.*)

> FN2. As the pages are not consecutively paginated, the Court refers to the pages assigned by the Electronic Case Filing system.

Although it is not entirely clear, plaintiff appears to allege that the Brooklyn District Attorney's Office

Not Reported in F.Supp.2d, 2012 WL 4863161 (E.D.N.Y.)
**(Cite as: 2012 WL 4863161 (E.D.N.Y.))**

maliciously prosecuted him by holding him on a charge of resisting arrest for seven extra days after dismissing underlying charges. (*Id.*) Plaintiff wants to "clear my name" and seeks "compensatory and punitive damages for the beating I took at the hands of N.Y.P.D. office[r]# 1275." (*Id.* at 7)

### DISCUSSION

#### A. Standard of Review

Title 28 of the United States Code, § 1915A requires this Court to review the complaint in a civil action in which a prisoner seeks redress from a governmental entity or from officers or employees thereof, and to "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint is frivolous, malicious, or fails to state a claim upon which relief may be granted." 28 U.S.C. § 1915A(b); *see Abbas v. Dixon,* 480 F.3d 636, 639 (2d Cir.2007).[FN3] Similarly, pursuant to the *in forma pauperis* statute, the court must dismiss a complaint if it determines that the action is "(i) frivolous or malicious, (ii) fails to state a claim upon which relief may be granted, or (iii) seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B).

> FN3. Although plaintiff has been released from custody, he was incarcerated at the time he filed his complaint and so is considered a "prisoner" under Section 1915A. *See Gibson v. Comm'r of Mental Health,* No. 04–cv–4350 (SAS), 2006 WL 1234971, *3 (S.D.N.Y. May 8, 2006) ("[C]ourts have determined that the PLRA does apply to a prisoner who filed suit during his confinement and thereafter was released from prison.").

**\*2** A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A claim will be considered "plausible on its face" "when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Although a *pro se* complaint must contain sufficient factual allegations to meet the plausibility standard, it is still held to less stringent standards than pleadings drafted by lawyers. *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007); *DiPetto v. U.S. Postal Serv.,* 383 F. App'x 102, 103 (2d Cir.2010). The court is obliged to construe plaintiff's pleadings liberally and interpret them as raising the strongest arguments they suggest, *Abbas,* 480 F.3d at 639. If a liberal reading of the complaint "gives any indication that a valid claim might be stated," the court should grant leave to amend. *See Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000); *Gomez v. USAA Fed. Sav. Bank.* 171 F.3d 794, 795 (2d Cir.1999).

#### B. Claims against the N.Y.P.D. and the District Attorney's Office

The N.Y.P.D. and the Kings County District Attorney's Office are not themselves suable entities. The police department is an agency of New York City, and the New York City Charter provides that suits "shall be brought in the name of the City of New York and not in that of any agency." N.Y. City Charter § 396; *see also Jenkins v. City of New York,* 478 F.3d 76, 93 n. 19 (2d Cir.2007). A district attorney's office also is not a separate legal entity capable of being sued pursuant to § 1983. *See Southerland v. Garcia,* No. 09–cv–2230 (JBW)(LB), 2010 WL 1849286, at *1 (E.D.N.Y. May 5, 2010); *Conte v. County of Nassau,* No. 06–CV–4746, 2008 WL 905879, at *1 n. 2 (E.D.N.Y. Mar. 31, 2008); *Hall v. Marshall,* 479 F.Supp.2d 304, 314 (E.D.N.Y.2007). Accordingly, the N.Y.P.D. and the District Attorney's Office are both dismissed as defendants.

Even construing plaintiff's claims against the N.Y.P.D. and Kings County D.A.'s office as claims against the City of New York, plaintiff still fails to state a claim. Municipalities such as the City of New

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4863161 (E.D.N.Y.)
**(Cite as: 2012 WL 4863161 (E.D.N.Y.))**

York can be liable under 42 U.S.C. § 1983 only if a plaintiff can show that a municipal policy or custom caused the deprivation of his or her constitutional rights. *See Monell v. Dep't of Soc. Servs.,* 436 U.S., 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Walker v. Cit y of New York,* No. 07–cv–1543 (JG), 2007 WL 1340252, at *2 (E.D.N.Y. May 4, 2007) ("A plaintiff is required to allege both the existence of a policy or custom and a causal connection between that policy and the unconstitutional conduct"). Proof of a single incident of unconstitutional activity is not sufficient to impose liability on a municipality unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy that can be attributed to a municipal policymaker. *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985); *Hartnagel v. City of New York,* No. 10–cv–5637 (TLM), 2012 WL 1514769, at *4 (E.D.N.Y. Apr. 30, 2012).

**\*3** Plaintiff does not allege a valid *Monell* claim against the City. With respect to plaintiff's claim for excessive force, plaintiff has not alleged that his arrest or the officer's treatment of him resulted from a policy or custom attributable to the City. Similarly, regarding the claim for malicious prosecution, plaintiff has not alleged that the District Attorney's decision to charge plaintiff with resisting arrest and to hold plaintiff in custody for an additional week related to this charge was the result of a municipal policy. The isolated incidents described in the complaint are not sufficient to support an inference that any individual acted pursuant to a municipal policy or custom. *See Walker v. Cit y of New York,* No. 07–cv–1543 (JG), 2007 WL 1340252, at *2 (E.D.N.Y. May 4, 2007) (dismissing complaint against City of New York where "even liberally construing plaintiff's claim, nothing suggest[ed] that the alleged constitutional violations were attributable to any municipal policy or custom").

Accordingly, the N.Y.P.D. and Kings County District Attorney's Office are both dismissed as defendants, with no substitution of the City of New York

or another municipal defendant. Plaintiff also may not name an individual prosecutor from the District Attorney's Office as a substitute defendant. Prosecutors are entitled to absolute prosecutorial immunity for "performing prosecutorial activities that are 'intimately associated with the judicial phase of the criminal process,' " including the decision whether or not to commence or maintain a prosecution. *Ying Jing Gan v. Cit y of New York,* 996 F.2d 522, 530 (2d Cir.1993) (quoting *Imbler v. Pachtman,* 424 U.S. 409, 430, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976)).

### C. Identifying the John Doe Defendant

Plaintiff has provided the badge number and precinct assignment of the John Doe police officer whom he alleges used excessive force during his arrest on May 31, 2012. In *Valentin v. Dinkins,* 121 F.3d 72 (2d Cir.1997) (*per curiam* ), the Second Circuit made clear that a *pro se* litigant is entitled to assistance from the district court in identifying a defendant. *See Walker,* 2007 WL 1340252, at *2. Accordingly, the Court hereby requests the Corporation Counsel for the City of New York, within 45 days of the date of this Order, to ascertain the full name of the individual whom plaintiff has partially identified as John Doe, Shield # 1275, of the 67 th Precinct, and to provide the address where this defendant can currently be served. Once this information is provided, plaintiff's complaint shall be deemed amended to reflect the full name of this officer, a summons shall be issued, and the Court shall direct service on the defendant.

### CONCLUSION

For the reasons set forth above, all of the claims against the N.Y.P.D. and the Kings County District Attorney's Office are dismissed pursuant to 28 U.S.C. § 1915A(b) and 28 U.S.C. § 1915(e) (2)(B). No summonses shall issue against these agencies. The Clerk of Court is directed to amend the caption to reflect the dismissal of those defendants.

**\*4** Plaintiff's claims shall proceed against the remaining individual John Doe defendant. The Clerk

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4863161 (E.D.N.Y.)
**(Cite as: 2012 WL 4863161 (E.D.N.Y.))**

of Court is respectfully directed to mail a copy of this Order and the Complaint to the New York City Law Department. Once Corporation Counsel has provided the requested information for the John Doe defendant, the Clerk is directed to amend the caption of the Complaint to reflect that information and to issue a summons. The United States Marshals Service is directed to serve a copy of the Complaint as amended by the Clerk, this Order, and the summons on the defendant. The Court refers this matter to Magistrate Judge Marilyn Go for pretrial supervision.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith and therefore *in forma pauperis* status is denied for purpose of an appeal. *See Coppedge v. United States,* 369 U.S. 438, 444–45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

SO ORDERED.

E.D.N.Y.,2012.
Rogers v. New York City Police Dept.
Not Reported in F.Supp.2d, 2012 WL 4863161 (E.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2010 WL 3724183 (N.D.N.Y.)
**(Cite as: 2010 WL 3724183 (N.D.N.Y.))**

Ⓗ

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Bruce THOMAS, Plaintiff,
v.
Dr. DOUGLAS, Orleans Correctional Facility; Dr. T.
Howard, Marcy Correctional Facility; and Dr. M.
Crook, Mt. McGregor Correctional Facility, Defend-
ants.

Civil Action No. 9:09–CV–0548 (GLS/DEP).

Aug. 12, 2010.

Bruce Thomas, Buffalo, NY, pro se.

Hon. Andrew M. Cuomo, Office of Attorney General,
State of New York, Adele Taylor–Scott Esq., Assis-
tant Attorney General, of Counsel, Albany, NY, for
Defendants.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate
Judge.

**\*1** Plaintiff Bruce Thomas, a former New York
State prison inmate who is proceeding *pro se* and *in
forma pauperis* ("IFP"), has commenced this action
pursuant to 42 U.S.C. § 1983, alleging that the de-
fendants deprived him of his civil rights during the
period of his confinement. In his complaint plaintiff
alleges that, in violation of the Eighth Amendment
protection against cruel and unusual punishment, he
was denied adequate medical treatment at three cor-
rectional facilities in which he was housed at the rel-
evant times. As relief, plaintiff's complaint seeks
monetary damages in the amount of $11.5 million.

Plaintiff's claims against two of the named de-
fendants have been *sua sponte* dismissed by the court
based upon an initial review of plaintiff's complaint
and the accompanying IFP application. The three
remaining named defendants have now moved to
dismiss plaintiff's claims against them based upon his
failure a state a cause of action upon which relief may
be granted. Having carefully considered the allega-
tions of plaintiff's complaint and the attached sup-
porting exhibits, without the benefit of any opposition
on the part of the plaintiff, and applied the requisite
deferential standard, I have concluded that plaintiff's
complaint fails to state a plausible deliberate medical
indifference claim against any of the three moving
defendants, and therefore recommend that it be dis-
missed, though with leave to replead.

I. *BACKGROUND*[FN1]

> FN1. In light of the procedural posture of this
> case, the following recitation is drawn prin-
> cipally from plaintiff's complaint, the con-
> tents of which have been accepted as true for
> purposes of the pending motion. *See Erick-
> son v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197,
> 2200 (2007) (citing *Bell Atlantic Corp. v.
> Twombly,* 550 U.S. 544, 127 S.Ct. 1955,
> 1965 (2007)); *see also Cooper v. Pate,* 378
> U.S. 546, 546, 84 S.Ct. 1733, 1734 (1964).
> Portions of the background description which
> follows have been derived from the exhibits
> attached to plaintiff's complaint, which may
> also properly be considered in connection
> with a dismissal motion. *See Cortec Indus.,
> Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47–48
> (2d Cir.1991), *cert. denied,* 503 U.S. 960,
> 112 S.Ct. 1561 (1992); *see also Samuels v.
> Air Transp. Local 504,* 992 F.2d 12, 15 (2d
> Cir.1993).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3724183 (N.D.N.Y.)
**(Cite as: 2010 WL 3724183 (N.D.N.Y.))**

At the time this action was filed plaintiff was a prison inmate entrusted to the care and custody of the New York State Department of Correctional Services ("DOCS").[FN2] *See generally* Plaintiff's Complaint (Dkt. No. 1). At the times relevant to his claims plaintiff was designated first to the Mt. McGregor Correctional Facility ("Mt.McGregor"), located in Wilton, New York, followed by the Marcy Correctional Facility ("Marcy"), located in Marcy, New York, and later the Orleans Correctional Facility ("Orleans"), located in Albion, New York, where he was placed into a program to prepare him for re-entry into society.[FN3] *See generally* Complaint (Dkt. No. 1) Statement of Claim.

> **FN2.** Plaintiff has since been released from custody, and is living in Buffalo, New York. *See* Dkt. Entry Dated 8/18/09.

> **FN3.** It appears that plaintiff was also incarcerated briefly at Camp Georgetown, another facility operated by the DOCS, during the relevant time period. *See* Complaint (Dkt. No. 1) Attachment Exh. C. None of plaintiff's claims in this action stem from medical treatment received while at Camp Georgetown.

Excerpts from plaintiff's ambulatory health record ("AHR") attached as exhibits to plaintiff's complaint reveal that while at McGregor, Marcy, and Orleans Thomas was examined and treated regularly for various medical ailments, including a lumbar back condition which required prescription medication and the use of a Transcutaneous Electrical Nerve Stimulation ("TENS") unit, and a heart condition for which he underwent surgery in September of 2008 while designated to Mt. McGregor. *See* Complaint (Dkt. No. 1) Attachment pp. 27, 36–37, 46, 60–77.

## II. *PROCEDURAL HISTORY*

This action was commenced on April 20, 2009.[FN4]

Dkt. No. 1. In his complaint, which was accompanied by portions of his DOCS medical records, Thomas asserted a claim of deliberate medical indifference and named, as defendants, DOCS Commissioner Brian Fischer, DOCS Deputy Commissioner Lester Wright, M.D., and three DOCS prison physicians, including Dr. Douglas, employed at Orleans; Dr. Howard, a prison physician at Marcy; and Dr. M. Crook, who works at Mt. McGregor. *Id.*

> **FN4.** Plaintiff brought this action in the United States District Court for the Western District of New York. Dkt. No. 1. The action was subsequently transferred to this district pursuant to an order issued by District Judge David G. Larimer on May 8, 2009. Dkt. No. 3.

*2 Following transfer of the action to this district and initial review of the complaint, on October 21, 2009 District Judge Gary L. Sharpe issued a decision denying plaintiff's IFP application, without prejudice to his right of renewal upon the submission of additional necessary information concerning his financial status, dismissing plaintiff's claims against defendants Fischer and Wright based upon the lack of any facts indicating their personal involvement in the constitutional violations alleged, and denying plaintiff's request to return the case to the Western District of New York.[FN5] Dkt. No. 13.

> **FN5.** Following the submission of additional materials, plaintiff's application for leave to proceed *in forma pauperis* was later granted. *See* Dkt. No. 15.

In lieu of answering, the remaining three defendants have moved for an order dismissing plaintiff's complaint pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief may be granted. Dkt. No. 20. In their motion, defendants argue that plaintiff's com-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3724183 (N.D.N.Y.)
(Cite as: 2010 WL 3724183 (N.D.N.Y.))

plaint and supporting medical records reveal that he was treated regularly and adequately for his various medical conditions, and that his complaint reveals nothing more than his dissatisfaction with the treatment provided, a claim which is not constitutionally actionable. *Id.* Despite passage of the March 29, 2010 deadline for responding, plaintiff has failed to submit any opposition to defendants' motion, which is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1) (B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

### III. *DISCUSSION*

#### A. *Dismissal Motion Standard*

A motion to dismiss a complaint, brought pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal,* ⸺ U.S. ⸺, ⸺, 129 S.Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 554, 555, 127 S.Ct. 1955, (2007)). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). *Id.* While modest in its requirement, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft,* 129 S.Ct. at 1950.

To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim which is plausible on its face. *Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (citing *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.' " *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974).

**\*3** In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1723, 1734 (1964); *Miller v. Wolpoff & Abramson, LLP,* 321 F.3d 292, 300 (2d Cir.2003), *cert. denied,* 540 U.S. 823, 124 S.Ct. 153 (2003); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005) (Kahn, J.). The burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) is substantial; the question presented by such a motion is not whether the plaintiff is likely ultimately to prevail, " 'but whether the claimant is entitled to offer evidence to support the claims.' " *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.,* 223 F.Supp.2d 435, 441 (S.D.N.Y.2001) (quoting *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995)) (citations and quotations omitted).

#### B. *Eighth Amendment Deliberate Indifference Standard*

Plaintiff's complaint challenges the adequacy of medical treatment provided to him by the three DOCS prison physicians sued. Claims that prison officials have intentionally disregarded an inmate's medical needs fall under the umbrella of protection from the imposition of cruel and unusual punishment afforded by the Eighth Amendment. *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291 (1976). That amendment prohibits punishment that involves the "unnecessary and wanton infliction of pain" and is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Id.; see*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3724183 (N.D.N.Y.)
**(Cite as: 2010 WL 3724183 (N.D.N.Y.))**

*also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)). To satisfy their obligations under the Eighth Amendment, prison officials must "ensure that inmates receive adequate food, shelter, and medical care, and must take reasonable measures to guarantee the safety of inmates." *Farmer,* 511 U.S. at 832, 114 S.Ct. at 1976 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 3200 (1984)) (internal quotations omitted).

A claim alleging that prison officials have violated the Eighth Amendment by inflicting cruel and unusual punishment must satisfy both objective and subjective requirements. *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009); *Price v. Reilly,* No. 07–CV–2634 (JFB/ARL), 2010 WL 889787, at *7–8 (E.D.N.Y. Mar. 8, 2010).[FN6] Addressing the objective element, to prevail in a case such as this a plaintiff must demonstrate a violation sufficiently serious by objective terms, "in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). With respect to the subjective element, a plaintiff must also demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.' " *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999). Claims of medical indifference are subject to analysis utilizing this Eighth Amendment paradigm. *See Salahuddin v. Goord,* 467 F.3d 263, 279–81 (2d Cir.2006).

> FN6. Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

1. *Objective Requirement*

**\*4** Analysis of the objective, "sufficiently serious", requirement of an Eighth Amendment medical indifference claim begins with an inquiry into "whether the prisoner was actually deprived of adequate medical care ...", and centers upon whether prison officials acted reasonably in treating the plaintiff. *Salahuddin,* 467 F.3d at 279. A second prong of the objective test addresses whether the inadequacy in medical treatment was sufficiently serious. *Id.* at 280. If there is a complete failure to provide treatment, the court must look to the seriousness of the inmate's medical condition. *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003). If, on the other hand, the complaint alleges that treatment was provided but was inadequate, the seriousness inquiry is more narrowly confined to that alleged inadequacy, rather than focusing upon the seriousness of the prisoner's medical condition. *Salahuddin,* 467 F.3d at 280. "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in treatment ... [the focus of] the inquiry is on the challenged delay or interruption, rather that the prisoner's underlying medical condition alone." *Id.* (quoting *Smith,* 316 F.3d at 185) (internal quotations omitted). In other words, at the heart of the relevant inquiry is the seriousness of the medical need, and whether from an objective viewpoint the temporary deprivation was sufficiently harmful to establish a constitutional violation. *Smith,* 316 F.3d at 186. Of course, "when medical treatment is denied for a prolonged period of time, or when a degenerative medical condition is neglected over sufficient time, the alleged deprivation of care can no longer be characterized as 'delayed treatment', but may properly be viewed as a 'refusal' to provide medical treatment." *Id.* at 186, n. 10 (quoting *Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000)).

Since medical conditions vary in severity, a decision to leave a condition untreated may or may not raise constitutional concerns, depending on the circumstances. *Harrison,* 219 F.3d at 136–37 (quoting, *inter alia, Chance v. Armstrong,* 143 F.3d 698, 702

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3724183 (N.D.N.Y.)
**(Cite as: 2010 WL 3724183 (N.D.N.Y.))**

(2d Cir.1998)). Relevant factors informing this determination include whether the plaintiff suffers from an injury or condition that a " 'reasonable doctor or patient would find important and worthy of comment or treatment' ", a condition that " 'significantly affects' " a prisoner's daily activities, or " 'the existence of chronic and substantial pain.' " *Chance,* 143 F.3d at 702 (citation omitted); *Lafave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *3 (N.D.N.Y. Apr. 3, 2002) (Sharpe, M.J.) (citation omitted).

2. *Subjective Element*

The second, subjective, requirement for establishing an Eighth Amendment medical indifference claim mandates a showing of a sufficiently culpable state of mind, or deliberate indifference, on the part of one or more of the defendants. *Salahuddin,* 467 F.3d at 280 (citing *Wilson v. Seiter,* 501 U.S. 294, 300, 111 S.Ct. 2321, 2325 (1991). Deliberate indifference, in a constitutional sense, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979); *Waldo v. Goord,* No. 97–CV–1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.) (same). Deliberate indifference is a mental state equivalent to subjective recklessness as the term is used in criminal law. *Salahuddin,* 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839–40, 114 S.Ct.1970).

**\*5** Mere negligence on the part of a physician or other prison medical official in treating or failing to treat a prisoner's medical condition, on the other hand, does not implicate the Eighth Amendment and is not properly the subject of a section1983 action. *Estelle,* 429 U.S. at 105–06, 97 S.Ct. at 292; *Chance,* 143 F .3d at 703. "Medical malpractice does not become a con-

stitutional violation merely because the victim is a prisoner." *Estelle,* 429 U.S. at 106, 97 S.Ct. at 292. Thus, for example, a physician who "delay [s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference. *Harrison,* 219 F.3d at 139. If prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," however, such conduct is actionable as deliberate indifference. *Harrison,* 219 F.3d at 138; *Kearsey v. Williams,* No. 99 Civ 8646, 2005 WL 2125874, at *5 (S.D.N.Y. Sep. 1, 2005).

C. *Plausibility Of Plaintiff's Medical Indifference Claim*

Plaintiff's medical records reveal that prior to being incarcerated he underwent three lumbar disc operations and had a TENS unit implanted in his back to assist in managing any residual pain. *See* Complaint (Dkt. No. 1) Attachment pp. 27, 64. In addition, plaintiff underwent heart surgery, in September of 2008, while incarcerated at Mt. McGregor, during which a stint was implanted.[FN7] *Id.* at pp. 71–76. Conspicuously lacking in either his complaint or the supporting documents are any factual allegations to support his claim that defendants were deliberately indifferent to his medical condition. Instead, plaintiff's deliberate indifference claim is set forth in wholly conclusory terms, which merely allege, for example, that he was "continuously denied proper treatment." *See, e.g.,* Complaint (Dkt. No. 1) at p. 9. Such conclusory allegations do not suffice without supporting facts to establish a plausible medical indifference claim capable of withstanding a dismissal motion. *Collins v. Artus,* No. 9:08–CV–470, 2009 WL 606176, at * 6–7 (N.D.N.Y. Mar. 9, 2009) (McAvoy, S.J. & Peebles, M.J.).

FN7. Plaintiff does not appear to complain regarding the treatment received for his heart condition.

Not Reported in F.Supp.2d, 2010 WL 3724183 (N.D.N.Y.)
**(Cite as: 2010 WL 3724183 (N.D.N.Y.))**

Turning to the specific allegations advanced against the three named defendants, I conclude that they similarly fail to satisfy requirements of *Iqbal* and *Twombly* to demonstrate the existence of a plausible medical indifference claim.

### 1. *Dr. M. Crook*

Dr. M. Crook was employed at the relevant times as a prison physician at Mt. McGregor. While it is somewhat unclear, it appears that plaintiff's quarrel with Dr. Crook is limited to his assignment of Thomas to an upper bunk, as well as a requirement that plaintiff engage in work activities despite his medical conditions. *See* Complaint (Dkt. No. 1) Statement of Claims p. 9.

Plaintiff's medical records reveal that he entered Mt. McGregor on or about July 24, 2007. *See* Complaint (Dkt. No. 1) Attachment p. 64. Excerpts from plaintiff's AHR reveal that he was seen by Dr. Crook the day after his arrival at the facility and reported that he was doing well and was using his TENS Unit "infrequently". Complaint (Dkt. No. 1) Attachment p. 66. Plaintiff was provided with batteries for the device on August 20, 2007, and again reported doing well with the use of his TENS unit on September 25, 2007, and later on February 1, 2008. *Id.* at pp. 67–68.

**\*6** Thomas' medical records reveal only one involvement on the part of Dr. Crook in the plaintiff's treatment while at Mt. McGregor and fail to support his claim of ongoing substantial pain as a result of his back surgery. Neither plaintiff's complaint, which is comprised wholly of conclusory allegations, nor the attached medical records demonstrate the existence of a plausible deliberate indifference claim against Dr. Crook. Because plaintiff's naked assertion that Dr. Crook violated his Eighth Amendment rights by refusing to provide him with a lower bunk permit and excuse him from work do not establish the existence of a plausible medical indifference claim, I recommend dismissal of the claims against defendant Crook. *See Moolenaar v. Champagne,* No. 9:03–CV–1464, 2006 WL 2795339, at * 7 (N.D.N.Y. Sept. 6, 2006) (Kahn, D.J. & Peebles, M.J.).

### 2. *Dr. T. Howard*

Defendant Howard, at the relevant times, was a DOCS physician stationed at Marcy. Plaintiff's records reveal that he was transferred into Marcy on October 29, 2008. Complaint (Dkt. No. 1) Attachment p. 46. The medical records associated with Thomas' admission into Marcy note plaintiff's surgery on September 30, 2008 for the insertion of a stint/cardiac catheter and that he suffers from chronic back pain requiring the use of a TENS unit, for which he required batteries and a lower bunk permit. *Id.*

Plaintiff's medical records reveal that upon his arrival at Marcy he was seen by Dr. Howard on November 7, 2008, who reviewed his medical circumstances and assessed his needs, and was provided with both a bottom bunk pass and a permit to carry his TENS unit, and he was scheduled for a follow-up visit with a cardiologist. *Id.* at p. 76; *see also id.* at p. 48. Those records also reflect that plaintiff was seen again on November 9, 2008 at medical call out for a teaching session, and again on November 11, 2008 when he requested a new battery for his TENS unit. Complaint (Dkt. No. 1) Attachment at p. 47.

On November 13, 2008, Thomas was seen at the clinic; on that occasion he reported experiencing considerable pain in his lower back and requested pain medication, which was provided. *Id.* at p. 47. Thomas again was seen by medical personnel on November 14, 2008, at which time he was provided with a permit for use of his TENS unit. *Id.* at p. 48. Plaintiff was seen for a third time on November 21, 2008, once again complaining of lower back pain, with numbness going down his right leg to his knee; he was seen by Dr. Howard three days later, on November 24, 2008, and provided with a prescription for a pain reliever. Complaint (Dkt. No. 1) Attachment p. 49. Plaintiff made additional visits to the clinic on November 28 and December 1, 2008 regarding his medications and

Not Reported in F.Supp.2d, 2010 WL 3724183 (N.D.N.Y.)
**(Cite as: 2010 WL 3724183 (N.D.N.Y.))**

was provided with a refill prescription for Naproxyn on December 5, 2008. *Id.* at pp. 51–52.

Once again, nothing within plaintiff's medical records from Marcy, which are presumably offered to supplement the otherwise bald and conclusory allegations of his complaint, reveal that Dr. Howard was aware of a serious medical need on the part of the plaintiff but was deliberately indifferent to that need, and the claims against him also should be dismissed.

### 3. *Dr. Douglas*

**\*7** Plaintiff was transferred into Orleans on January 23, 2009 and apparently remained there until his release from prison a few months later. Complaint (Dkt. No. 1) Attachment pp. 15–24. Plaintiff alleges that upon his arrival at Orleans he notified Dr. Douglas that he needed his TENS unit reprogrammed, but was told that due to the short time remaining before his release an outside consultation could not be arranged. Complaint (Dkt. No. 1) at pp. 7–8. Plaintiff bases his assertion that the TENS unit needed reprogramming on a letter dated February 6, 2007, from Dr. Robert Plunkett indicating that Thomas had an appointment scheduled for April 12, 2007 at the Buffalo General Hospital. *See* Complaint (Dkt. No. 1) Attachment p. 26. There is no indication whether the letter, which predated plaintiff's arrival at Orleans by nearly two years, was ever provided to DOCS officials, nor does plaintiff's AHR make any reference to an earlier request for such a referral. *Id.* Moreover, the letter does not state the purpose of the scheduled visit and does not suggest that it was to reprogram the TENS unit. *Id.*

While at Orleans, plaintiff was issued permits for his TENS unit as well as for use of a bottom bunk. Complaint (Dkt. No. 1) Attachment pp. 15–16. Plaintiff was seen by medical personnel on January 29, 2009, though the entry associated with that visit is largely illegible, and on the following day was admitted to the facility's emergency room with a nose bleed, which apparently was packed by Dr. Lewis,

who is not a defendant in this case, and was provided with a thirty-day prescription for Ultram, a pain reliever.[FN8] *Id.* at pp. 19–20. Plaintiff again was seen on February 12, 2009 for a hypertension consultation, at which time he reported having "no complaints" and that he was "active in sports". Complaint (Dkt. No. 1) Attachment p. 20. On February 13, 2009, and again on February 27, 2009, plaintiff went to the medical unit requesting more Ultram. *Id.* at pp. 20–21. The last entries regarding medical treatment at Orleans reference visits on March 11, 2009, during which plaintiff reported suffering from discomfort, and again on March 12, 2009, when he stated that he suffered from chronic pain and requested and was given a prescription for Ultram. *Id.* at p. 22.

> FN8. Ultram is a trademark preparation of tramadol hydrochloride, an opiod analgesic used for treatment of moderate to moderately sever pain following surgical procedures. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1977, 2027 (31st Ed.2007).

As with defendants Howard and Crook, the allegations of plaintiff's complaint, as supplemented by the relevant medical records associated with his incarceration at Orleans, fail to reveal that defendant Dr. Douglas was either aware of any serious medical need on the part of the plaintiff, or that he failed to address such a need. Plaintiff's complaint therefore fails to assert a plausible medical indifference claim as against Dr. Douglas, and this portion of defendants' motion to dismiss should also be granted.

### D. *Leave to Replead*

In light of my recommendation that plaintiff's complaint be dismissed as legally insufficient I will consider whether, in view of his *pro se* status, plaintiff should be permitted to file an amended complaint in an effort to cure the perceived deficiencies.

**\*8** Ordinarily, a court should not dismiss a com-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3724183 (N.D.N.Y.)
**(Cite as: 2010 WL 3724183 (N.D.N.Y.))**

plaint filed by a *pro se* litigant without granting leave to amend at least once if there is any indication that a valid claim might be stated. *Branum v. Clark,* 927 F.2d 698, 704–05 (2d Cir.1991) (emphasis added); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires"); *see also Mathon v. Marine Midland Bank, N.A.,* 875 F.Supp. 986, 1003 (E.D.N.Y.1995) (leave to replead granted where court could not say that under no circumstances would proposed claims provide a basis for relief).

In essence, plaintiff's complaint alleges that his medical needs were not met by the defendants, at least not to his complete satisfaction. Because plaintiff could potentially allege additional facts to satisfy his obligation to plead a plausible Eighth Amendment violation claim, I recommend that he be afforded the opportunity to file an amended complaint.

Plaintiff should be reminded, however, that any subsequent amended complaint submitted to the court should be in proper form, including separately numbered paragraphs each limited, to the extent practicable, to setting forth a single, discrete set of circumstances. *See* Fed.R.Civ.P. 10(b); *see also Hunt v. Budd,* 895 F.Supp. 35, 38 (N.D.N.Y.1995) (McAvoy, C.J.) ("complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning.") (citing *Barr v. Abrams,* 810 F .2d 358, 363 (2d Cir.1987) (other citations omitted)); *Pourzandvakil v. Humphry,* No. 94–CV–1594, 1995 U.S. Dist. LEXIS 7136, at *24–25 (N.D.N.Y. May 22, 1995) (Pooler, D.J.) (citation omitted). Any such amended complaint, which shall supersede and replace in its entirety the previous complaint filed by plaintiff, must contain a caption that clearly identifies, by name, each individual or entity that plaintiff is suing in the present lawsuit, and must bear the case number assigned to this action. *See Harris v. City of N.Y.,* 186 F.3d 243, 249 (2d Cir.1999) (citing *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d

Cir.1994)); Fed.R.Civ.P. 10(a).

IV. *SUMMARY AND RECOMMENDATION*

Plaintiff's Eighth Amendment cause of action, alleging deliberate medical indifference based upon treatment received by him from medical personnel at three separate prison facilities, is stated in wholly conclusory terms, with no factual allegations to support the claim. While plaintiff attempts to augment those skeletal allegations with records of his medical treatment at those facilities, they in fact fail to substantiate that the three named defendants were aware of but deliberately indifferent to any serious medical need on plaintiff's part. Rather, those records and plaintiff's complaint, at best, disclose his dissatisfaction with the treatment that he received from those doctors and others at the facilities. In light of plaintiff's failure to plead facts demonstrating the existence of a plausible deliberate medical indifference claim against any of the three defendants remaining in this case, it is hereby respectfully

**\*9** RECOMMENDED that defendants' motion to dismiss (Dkt. No. 20) be GRANTED, and that plaintiff's complaint be dismissed as against the remaining defendants, with leave to replead.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2010.
Thomas v. Douglas

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3724183 (N.D.N.Y.)
**(Cite as: 2010 WL 3724183 (N.D.N.Y.))**

Not Reported in F.Supp.2d, 2010 WL 3724183 (N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.